COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

ROGER REISTER,
)
 No. 08-01-00373-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 168th District Court

)


THE STATE OF TEXAS,
)
 of El Paso County, Texas

)


 Appellee.
)
 (TC# 20010D03915)


O P I N I O N



 Roger Reister was convicted on four counts of criminal solicitation of capital murder in the
death of his wife. He was sentenced to life imprisonment. We affirm.

FACTUAL SUMMARY


 Captain Lynn Armstrong Reister was stationed in Germany from 1994 until 1997 as part of
her military service. In February 1996, she married Sergeant Roger Raymond Reister who was also
stationed there. Their son was born in June 1996. In November 1997, the family moved to El Paso. 
From March 1999 until August 1999, Appellant was deployed to Saudi Arabia; Lynn was deployed
there between March 2000 and September 2000. Appellant was stationed at Fort Bliss during her
absence. The couple began having marital difficulties in December and separated for about a week
and a half. They reconciled in January 2001 and Appellant moved back into their house. Shortly
thereafter, Lynn told her mother that she was pregnant with the couple's second child. She also
announced that she had been assigned to teach ROTC at a university in Minnesota. She was
scheduled to leave for Minnesota on June 1. She was murdered on May 24. At the time of her death,
she was thirty years old and six months' pregnant.

The Non-Accomplice Testimony


 Much of the testimony at trial focused on the activities at the Reister home while Lynn was
deployed to Saudi Arabia. Anthony Bastio, Patrick Muller, Scott Darcy, and Appellant were military
acquaintances who frequented the Stampede nightclub. During Lynn's absence, Bastio visited at
Appellant's house every weekend and often spent the night after returning from the bar. Parties at
the Reister home were frequent and young women also spent the night occasionally. Appellant told
Bastio on several occasions that he was having marital difficulties with his wife. He also indicated
that he thought Lynn was having an affair.

 Appellant met April Lamphere at the Stampede in August 2000, while Lynn was stationed
in Saudi Arabia. She was present at Appellant's home on several occasions when Lynn would call
from overseas. Appellant would not always answer the telephone, instead allowing the answering
machine to pick up. Appellant talked about his wife frequently, had negative things to say about her,
and wanted to divorce her because he believed she was having an affair. Appellant told Lamphere
he had spoken with an attorney and the divorce would be finalized when Lynn returned. 

 Once Lynn came back to El Paso, the parties stopped but Appellant continued to see
Lamphere on a regular basis. Their liaisons occurred several times a week and mostly at Lamphere's
apartment, but she would on occasion go by the Reister home at 5 or 5:30 a.m., after Lynn had left
for work. Appellant was concerned that if his adultery were discovered by his superiors at the base,
he would be sent to Fort Leavenworth. He told Lamphere that he could alter the brakes on Lynn's
car but he was afraid their son could be injured. He also said that if Lynn were to die, the proceeds
from an insurance policy would enable him to pay off the mortgage. Appellant discussed Lynn's
death with Lamphere on three occasions, once admitting that he would not be able to kill her himself,
because he couldn't "look in his son's eyes and know that he killed his mother." Appellant
mentioned to Lamphere that his close friend Patrick Muller might do the job. "I believe his
statement was that he couldn't do it, but Mo (1) could."

 In November 2000, Lamphere became pregnant with Appellant's child. Appellant was
excited about the pregnancy, shared the news with his friends, and speculated that Lamphere was
pregnant with twin girls whom he wanted to name Ripley Renee and Raven Rochelle. Lamphere
visited Appellant at the military barracks where he lived during his separation from Lynn. Their
relationship ended when Appellant and Lynn attempted to reconcile. Appellant soon denied
paternity of Lamphere's child and asked for a paternity test. Because of her concerns over the
amniocentesis procedure, she declined to undergo testing until her child was born. In February,
Lamphere informed First Sergeant Sullivan and Captain Moore--Appellant's superior officers--of
the affair and told them she was seeking child support. She denied telling them she wanted
Appellant to go to prison. (2) Lamphere's child was born in July 2001. By that point, Appellant had
been arrested and since she no longer wanted him to have anything to do with the baby, she
abandoned her efforts to obtain support.

 Sara Woods met Appellant in January 2000. She lived at the Reister residence for a short
time during the summer of 2000 while Lynn was in Saudi Arabia. During that time, Appellant told
her that his wife was having an affair. He wanted a divorce but Lynn earned more money and he was
afraid that he we would lose custody of his son. Appellant confided in Woods that Lamphere was
pregnant with his child. He wanted twin girls and had already selected names for them.

 Woods testified in some detail concerning the events of May 17, 2001 at the Stampede
nightclub:

 Q: Did you ask [Appellant] anything in regards to his divorce on that night?


 A: Yes. I asked him how his marriage was going and if he was still planning on
getting a divorce.


 Q: And on this May 17, 2001, what did he tell you?


 A: He told me that he had a plan to kill his wife.


 Q: What did you -- what was your answer in response to that?


 A: I thought he was joking.


 Q: Did you ask him if he was joking?


 A: I said, 'You're kidding, right?'


 Q: What did he say?


 A: He said, 'No, I'm not.'


 Q: Did he relay to you any dollar amounts that had been offered?


 A: Yes, he did. He had told me that he was hiring, I guess, for lack of a better word,
a hit man for $1,000, and if his wife was successfully murdered, that when he got her
life insurance of $250,000, he would pay the rest of the debt off to them.


 Q: Now, did he talk about any past attempts on his wife's life?


 A: Yes, he did. He told me that there had already been two prior attempts, one by a
person he did not mention and one by his brother. Then I asked if that was Rodney. 
And he said, yes, it was. And he went into detail to tell me that.


 Q: Before we get to that, did you ask him why -- I mean, $1,000? What was your
response to just $1,000?


 A: I said, 'Why would you just pay someone to do something like that just $1,000?' 
He said, 'I would do that so that I could draw a small amount out of my bank and it
couldn't be traced back to me.'


 Q: And did he also mention something in regards to some life insurance? What did
he tell you about that life insurance?


 A: He told me that Lynn had $250,000 in life insurance and he would use that to pay
off whoever would kill Lynn later after she was dead.


Woods then described how Appellant had explained to her that the hit man was someone he knew
so that he could blackmail him if necessary. He detailed Rodney's attempt on Lynn's life. Rodney
had entered the house, heard Lynn moaning, and thinking that she was with another man, became
alarmed and left.

 Q: Did you ever ask him why not do it yourself?


 A; Yes, I did.


 Q: And what was his response to that?


 A: Because it would leave too many clues and it would lead back to him and he
doesn't want to get caught for it.


 Q: Did [Appellant] ever say anything about committing a perfect murder on his wife?


 A: Yes, he did.


 Q: What was that?


 A: He said that if he had someone else do it, nothing would lead back to him if he did
it right, and it would be a perfect murder because he would never get caught.


 Q: Now, did you believe him?


 A: At first I thought he was joking, but the more he talked about it, the more I started
to believe that maybe there was something -- a ring of truth about it. 


Woods went to the police after she learned of Lynn's death. 

 On cross-examination, Woods admitted that she had sarcastically told Appellant he should
just kill Lynn and bury her out in the desert. She also admitted that she did not call the police or
notify Lynn about Appellant's statements. In her statement to police, she indicated she thought
Appellant was joking; she never mentioned that she felt his comments "had a ring of truth about it." 
 Jacob Frietze met Appellant during the summer of 2000. They often went to the Stampede
nightclub together and became close friends. On May 3, 2001, Appellant told Frietze that his plans
to kill Lynn had been finalized and that when it happened, he wanted Frietze to act surprised. 
Appellant mentioned that he had paid someone $1,000 to kill his wife and that he had been stashing
money away so "there would be no documentation of where it came from and how much was taken
out."

Count 1 -- The Solicitation of Patrick Muller


 Patrick Muller became close friends with Appellant while they were both stationed in Saudi
Arabia in mid-1999. After Lynn left for the Middle East, Muller lived at Appellant's house. He
described the frequent parties and how Scott Darcy, Jacob Frietze, and Sara Woods would often stay
overnight afterward.

 Appellant indicated to Muller several times that he was having marital problems and that he
thought his wife was seeing someone else. After Appellant got off the phone with Lynn one night,
he told Muller that he thought about stabbing her. Between April 2000 and August 2000, Appellant
often initiated conversations about killing Lynn. One scenario involved Muller walking into the
house, shooting her, and ransacking the house to make it look like a robbery. Another scenario
involved Muller stabbing Lynn in the throat, where it would appear that she fell on a knife. Muller
said that these discussions would occur weekly, usually after Appellant had talked with his wife on
the phone. Appellant told Muller that if Lynn were killed, he would receive $200,000 in proceeds
from the military insurance policy and explained how he intended to spend it, noting that "you could
live on money like that. You could pay off vehicles, pay off the house." Appellant even offered
Lynn's Saturn to Muller on several occasions if he would kill her. Muller moved out of the house
a few weeks before Lynn returned from Saudi Arabia in August 2000. Because of a second
deployment, Muller did not see Appellant very often after that, but in May 2000 when Muller visited
at Appellant's house, Appellant showed him a brown briefcase and said it contained $10,000.

 In March 2001, Muller went to see Appellant at Fort Bliss. They went out to Appellant's
truck to talk in private.

 Q: And you all are talking. What are you all talking about?


 A: We're talking about Captain Reister, ma'am.


 Q: In what regards?


 A: That his marriage is not going very well and that he was still thinking about
killing her, ma'am.


 Q: How does the conversation progress?


 A: It turns to the point where he asks me to kill her again.


 Q: And how does he say this to you?


 A: I don't understand the question, ma'am.


 Q: Did he just come out and say, 'Will you kill her for me,' or how did it come
about?


 A: No, ma'am. We're talking about a few other things and it just kind of slowly
progressed into it.


 Q: And how -- what discussion occurred? I mean, what all did you talk about?


 A: Pretty much it started out on, well, what each of us have been doing since we
haven't seen each other for a period of time, and he gave me a cassette tape. And I
don't know, we were listening to some music, and then he started going into that he
was having problems with his divorce -- or his marriage, I mean. And then he asked
me if I would kill Captain Reister, ma'am.


 Q: What did you tell him?


 A: Yes, I would.


 Q: Why?


 A: Roger is a friend of mine. 


They then began to outline a plan. Appellant would arrange to pick up his son from day care and
Lynn would be at home alone. The front door would be open (3) and Appellant would leave a knife
on the table behind it. Muller was to proceed through the living room. Lynn would most likely be
in the bathroom taking a shower or just getting out of the shower. Appellant told Muller that if he
stabbed Lynn in the neck, she would be unable to scream. After Lynn was dead, Muller was to
change into a different set of clothes, ransack the house, and then dispose of the clothes and the
weapon. (4) The dogs would be outside to prevent them from barking. It was also during this
discussion that Appellant told Muller he would be the beneficiary of the military insurance policy:

 Roger told me that I was going to get the 250,000 from the Army. He told me that
he was going to get it under his name so there wouldn't be any problems with me. 
Roger would deposit it into his account and I would take it as I needed it so as not to
draw suspicion if he were to give it all to me at once. 


 Muller went to the Reister residence about a week later, which according to his memory was
either March 13 or 14. Around 5:45 p.m. he opened the unlocked door, but did not enter because
he was alarmed when he saw the next door neighbor. He pretended to ring the doorbell so as not to
draw suspicion and left the premises. Muller later went to Appellant's office and told him what had
happened. Appellant appeared to be angry with him since Lynn was still alive. Muller was
scheduled for leave beginning March 16 and he left El Paso for Wisconsin, returning on March 29. 
 Two months later, on May 23, Muller saw Appellant and Lynn as they were leaving the
parking lot at the base. Appellant told him that he and Lynn "were doing well, that they loved each
other very much." He mentioned that Lynn had taken a job in Minnesota, that they planned on
moving soon, and that the family was doing well. Appellant looked at him and winked his eye with
a smirk on his face. Muller knew Appellant was up to something. He believed that Appellant had
"rigged it so he wouldn't have to go to Minnesota." Muller left for Colorado with his fiancee that
night to attend her cousin's funeral. A friend called him the next night to tell him of Lynn's murder. 
Upon his return to El Paso, Muller initially told the police that he never went to the Reister residence
to kill Lynn. After receiving immunity from the State and the military, he changed his story and
admitted that he actually went to the Reister residence to kill Lynn at Appellant's instruction. 

 Muller was rigorously and effectively cross-examined concerning the inconsistencies in his
various statements to police, impossibilities in his explanation of events, and flaws in the murder
plan. For example, the defense presented a series of photographs of the front of the Reister home
which refuted Muller's claim that he could see the next door neighbor as he stood at the front door. 
Muller admitted lying to the grand jury. He had no explanation as to why Appellant would have
been alone at Fort Bliss following the attempt on Lynn's life when common sense dictates he would
have planned an alibi witness to confirm his whereabouts. Finally, counsel elicited that Muller's
testimony was flawed because Lynn--not Appellant--actually retrieved their son from day care on
both March 13 and 14. Consequently, the child would have been present at the time of his failed
attempt on Lynn's life, something Appellant would have sought to avoid. Muller would not have
a wanted a witness, either, particularly one who could identify him.

Count II -- The Brian Broxterman Solicitation


 Brian Broxterman knew Appellant through a mutual friend and saw him occasionally at the
Stampede nightclub or at work. In the early part of May 2001, Appellant was instructed as part of
his military assignment to stop by Broxterman's house on Fort Bliss to inform him that his yard
needed to be mowed and the furniture needed to be removed from the back porch. On May 17,
Broxterman saw Appellant as he was returning to work from his lunch break. Appellant asked him
if he needed money or knew of anybody that would want to make some money. Appellant told him
that "he wanted his wife pretty much killed, and an X amount of dollars." Appellant also mentioned
that his wife was pregnant. He explained that Lynn's car alarm was so loud, no one would be able
to hear anything if it were set off. Appellant indicated that his wife had a life insurance policy. He
gave Broxterman his phone number and told him to call if he were interested. Broxterman did not
take Appellant's offer seriously.

 Broxterman learned of Lynn's murder the next day when Patrick Muller called him from
Colorado. Broxterman admitted to his wife that he knew something about it and decided to go to
the police, but officers arrived at his house for questioning before he ever contacted them.

Counts III and IV -- The Rodney Reister Solicitations


 Rodney Reister was released from a Florida jail on unrelated charges in December 2000. 
Appellant and Lynn traveled to Florida to visit Rodney and the brothers' mother shortly thereafter. 
The trip coincided with the couple's efforts at reconciliation and they brought Rodney back to
El Paso with them. He moved into their home for a brief period. He began dating Amber Young
in January 2001 and they rented an apartment together in April. At some point, Appellant told
Young "that Rodney was no good for [her]." Young relayed his statement to Rodney, who became
upset. As a result, the brothers' relationship cooled until some time in May. Then on May 23, the
day before the murder, Appellant came to their apartment and was speaking quietly about something
with Rodney, but Young was unable to hear the conversation. The next morning, Rodney got out
of bed to answer a telephone call at around 6 a.m. About fifteen minutes later, he dressed and left
the apartment. He returned some thirty minutes later. Although she was uncertain, Young thought
she heard Appellant's voice in her apartment that morning.

 Santiago Alaniz was employed at a Philips 66 gas station. On May 24, he saw Appellant and
his son enter the store between 5:45 a.m. and 7 a.m. Appellant spoke with Sergeant Grimes, who
happened to be there. Sergeant Grimes placed the conversation at 5:50 a.m. Sergeant Ward testified
that when he arrived at work at 6:50 a.m., Appellant was already there. Sergeant Eisen testified that
he and Appellant were assigned to assemble shelves in their office that morning. Appellant went to
Home Depot between 9:30 a.m. and 11:45 to purchase additional shelving. He tried to call Lynn
before he left, but he received no answer. He called her a second time when he returned, but he still
received no answer. He mentioned to Sergeant Ward that Lynn was at the hospital because of
complications with her pregnancy. Rodney showed up that afternoon and spoke with Appellant, an
unusual occurrence since Rodney rarely visited his brother at work. Sergeant Ward released
Appellant from his duties at 4 p.m. and Appellant left to go home. Sergeant Eisen testified that he
had to make him leave the office that afternoon:

 We had to tell him with a direct order, 'Go, go home, get out of here. We're not
going to get in trouble with the command unit because you're here.' 


 Police were called to the Reister residence in El Paso County, Texas, at 5:20 p.m. that
afternoon. They found Lynn Reister lying in a pool of blood on the floor of the master bedroom. 
The cause of death was determined to be severe trauma to the neck and throat area caused by deep
lacerations. The officers searched the remainder of the house and determined there had been no
forced entry. It appeared that nothing had been stolen. Lynn's car keys, her purse, and her
checkbook were all on the table near the front door.

 After Lynn's murder, Patrick Muller was jailed for an unrelated offense and while he was
incarcerated, Rodney Reister was placed in his cell. He was upset and crying, and Muller tried to
calm him down. Muller detailed their meeting:

 Rodney said that he couldn't believe what Roger had done to him. He felt betrayed
and he was very mad. I asked Rodney why he killed Lynn. He said he did it strictly
for love because he loved his brother, Roger. Rodney said there was no money
involved, but Roger said he was going to take care of Rodney.


Appellant's Version of Events


 Appellant testified at trial and described the ups and downs of his relationship with Lynn. 
During the five years of their marriage, they lived together only two and a half years due to the
interruptions of military deployment. He denied telling friends that his wife was having an affair. 
He admitted his own affair with Lamphere although he contended the sexual relationship ended in
October. Although he and Lynn separated for a brief period in December, they had participated in
marriage counseling with a counselor on post. While it would not be easy, they had agreed to put
past behind them and continue on with their marriage. The trip to Florida was designed to allow the
couple "[t]o start over again, to start a new [sic] her and myself, to rebuild our bond together . . . ." 
Appellant was looking forward to moving his family to Minnesota. It would allow the couple to
spend more time together with no deployments except summer assignments to North Carolina. He
intended to play "Mr. Mom" and focus on his college education while Lynn taught in an ROTC
professorship.

 At the time he brought his brother back to El Paso from Florida, Appellant had no idea of the
severity of Rodney's problems. Rodney was told from the beginning that he could live at the Reister
home for only forty-five days. On the forty-fifth day, Appellant told him "to get his stuff and leave." 
Rodney had a key to the house while he was living there. Appellant adamantly denied having asked
his brother to kill his wife. He never told Jacob Frietze that he had paid $1,000 to a hit man to
murder his wife. He never talked to Broxterman about killing his wife. Appellant never discussed
plans to kill Lynn with Patrick Muller. He denied telling Lamphere that he had thought about
tampering with Lynn's brakes or that Muller could kill Lynn. He denied talking with Sara Woods
at the Stampede on May 17 because he was not even there that evening. (5) In short, he accused
everyone else of lying. 

LEGAL AND FACTUAL SUFFICIENCY


 In Points of Error One through Eight, Appellant challenges the legal and factual sufficiency
of the evidence to support the jury's finding that he engaged in criminal solicitation, with the intent
that a capital felony be committed, namely, capital murder, to wit: the employment of another to
commit murder for remuneration and the promise of remuneration.

Standards of Review


 In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must
review all the evidence, both State and defense, in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61
L.Ed.2d 560, 573 (1979); Geesa v. State, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991). We must
evaluate all of the evidence in the record, whether admissible or inadmissible. Wilson v. State, 7
S.W.3d 136, 141 (Tex.Crim.App. 1999); Johnson v. State, 967 S.W.2d 410, 412 (Tex.Crim.App.
1998). We do not resolve any conflict of fact or assign credibility to the witnesses, as it was the
function of the trier of fact to do so. See Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App.
1992); Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). Instead, our duty is only to
determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of
the evidence admitted at trial in a light most favorable to the verdict. Adelman, 828 S.W.2d at 422. 
Any inconsistencies in the evidence are resolved in favor of the verdict. Matson, 819 S.W.2d at 843. 
The standard of review is the same for both direct evidence and circumstantial evidence cases. 
Geesa, 820 S.W.2d at 158.

 When conducting a factual sufficiency review, we consider all of the evidence, both
admissible and inadmissible, but we do not view it in the light most favorable to the verdict. Clewis
v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996); Levario v. State, 964 S.W.2d 290, 295
(Tex.App.--El Paso 1997, no pet.). We review the evidence weighed by the jury that tends to prove
the existence of the elemental fact in dispute and compare it with the evidence that tends to disprove
that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Jones v. State, 944 S.W.2d 642,
647 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). A
defendant challenging the factual sufficiency of the evidence may allege that the evidence is so weak
as to be clearly wrong and manifestly unjust, or in a case where the defendant has offered contrary
evidence, he may argue that the finding of guilt is against the great weight and preponderance of the
evidence. See Johnson, 23 S.W.3d at 11. Although we are authorized to set aside the fact finder's
determination under either of these two circumstances, our review must employ appropriate
deference and should not intrude upon the fact finder's role as the sole judge of the weight and
credibility given to any evidence presented at trial. See Johnson, 23 S.W.3d at 7. We are not free
to reweigh the evidence and set aside a verdict merely because we feel that a different result is more
reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997); Clewis, 922 S.W.2d at 135. 

Elements of the Offense


 The gravaman of Appellant's sufficiency complaints is that the State's witnesses were
accomplices whose testimony was not corroborated as required by Tex.Pen.Code Ann. §
15.03(b)(Vernon 2003) and Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon 1979). The offense of
criminal solicitation is found in Tex.Pen.Code Ann. § 15.03:

 (a) A person commits an offense if, with intent that a capital felony or felony of the
first degree be committed, he requests, commands, or attempts to induce another to
engage in specific conduct that, under the circumstances surrounding his conduct as
the actor believes them to be, would constitute the felony or make the other a party
to its commission.


 (b) A person may not be convicted under this section on the uncorroborated
testimony of the person allegedly solicited and unless the solicitation is made under
circumstances strongly corroborative of both the solicitation itself and the actor's
intent that the other person act on the solicitation. 


 (c) It is no defense to prosecution under this section that:


 (1) the person solicited is not criminally responsible for the felony
solicited;


 (2) the person solicited has been acquitted, has not been prosecuted
or convicted, has been convicted of a different offense or of a
different type or class of offense, or is immune from prosecution;


 (3) the actor belongs to a class of persons that by definition of the
felony solicited is legally incapable of committing the offense in an
individual capacity; or


 (4) the felony solicited was actually committed.


 (d) An offense under this section is:


 (1) a felony of the first degree if the offense solicited is a capital offense; 

 or


 (2) a felony of the second degree if the offense solicited is a felony of the 

 first degree.


Tex.Pen.Code Ann. 15.03. The offense of solicitation is complete when the defendant has intent
and acts to induce another to engage in felonious conduct. Whatley v. State, 946 S.W.2d 73, 79
(Tex.Crim.App. 1997); State v. Brinkley, 764 S.W.2d 913, 915 (Tex.App.--Tyler 1989, no pet.);
Majid v. State, 713 S.W.2d 405, 407-08 (Tex.App.--El Paso 1986, pet. ref'd). The statute does not
allow a conviction based solely on the uncorroborated testimony of the person allegedly solicited. 
The circumstances surrounding the solicitation must strongly corroborate the solicitation itself and
the actor's intent that the other person act on the solicitation. Tex.Pen.Code Ann. § 15.03(b);
Saunders v. State, 572 S.W.2d 944, 954-55 (Tex.Crim.App. 1978); Thomas v. State, 31 S.W.3d 422,
424 (Tex.App.--Fort Worth 2000, pet. ref'd); Sheffield v. State, 847 S.W.2d 251, 258
(Tex.App.--Tyler 1992, pet. ref'd). The test used to evaluate corroborating testimony requires that
we eliminate from consideration the accomplice testimony and then determine whether there is other
incriminating evidence tending to connect the defendant with the crime. Adams v. State, 685 S.W.2d
661, 665 (Tex.Crim.App. 1985); Richardson v. State, 681 S.W.2d 683, 687 (Tex.App.--Houston
[14th Dist.] 1984), aff'd, 700 S.W.2d 591, 594 (Tex.Crim.App. 1985). Article 38.14 of the Code
of Criminal Procedure provides: 

 A conviction cannot be had upon the testimony of an accomplice unless corroborated
by other evidence tending to connect the defendant with the offense committed; and
the corroboration is not sufficient if it merely shows the commission of the offense.

 

Tex.Code Crim.Proc.Ann. art. 38.14. It is not necessary that the corroboration directly link the
defendant with the crime or that it be sufficient evidence in itself to establish guilt. Richardson, 700
S.W.2d at 594; Shannon v. State, 567 S.W.2d 510 (Tex.Crim.App. 1978). The court should consider
all of the non-accomplice evidence even if it is entirely circumstantial. Id. In determining the legal
sufficiency of the solicitation as charged, we must also consider the evidence pertaining to the
multiple solicitations, the non-accomplice testimony and motive. Independent evidence verifying
the accomplice's version as opposed to the defendant's version is corroborative even if it only relates
to a mere detail as opposed to a substantive connection between the defendant and the offense. 
Davis v. State, 68 S.W.3d 273, 281 (Tex.App.--Dallas 2002, pet. ref'd); Lee v. State, 29 S.W.3d 570,
577 (Tex.App.--Dallas 2000, no pet.).

Analysis


 The non-accomplice evidence does not have to directly link Appellant to the crime, nor does 
it alone have to establish Appellant's guilt beyond a reasonable doubt; rather, the non-accomplice
evidence merely has to tend to connect Appellant to the offense. Burks v. State, 876 S.W.2d 877 at
888 (Tex.Crim.App. 1994); Reed v. State, 744 S.W.2d 112, 126 (Tex.Crim.App. 1988); Granger v.
State, 683 S.W.2d 387, 392 (Tex.Crim.App. 1984). We have already outlined the testimony of
Anthony Bastio, April Lamphere, Sara Woods, and Jacob Frietze in considerable detail. The
combined cumulative weight of the incriminating evidence furnished by these non-accomplice
witnesses case satisfies the requirement of corroboration. Reed, 744 S.W.2d at 126.

 We may also consider the testimony of each individual whom Appellant solicited as
corroboration of the other solicitees, whose testimony we have also detailed. Our conclusion is
supported by Ganesan v. State, 45 S.W.3d 197, 203 (Tex.App.--Austin 2001, pet. ref'd) and Varvaro
v. State, 772 S.W.2d 140, 143-44 (Tex.App.--Tyler 1988, pet. ref'd). In Ganesan, the defendant
solicited one person to kill his wife, and then sixteen months later, solicited a different individual. 
The court of appeals determined that the earlier solicitation tended to corroborate the second
solicitee's testimony both as to the solicitation itself and as to Ganesan's intent that the second
solicitee act on the solicitation. The court in Varvaro drew the same conclusion. Varvaro, 772
S.W.2d at 144.

 Still further, while evidence of motive is insufficient in and of itself to corroborate an
accomplice's testimony, it may be considered with other evidence to connect the accused with the
crime. Reed, 744 S.W.2d at 127; Ganesan, 45 S.W.3d at 202. Here, the State presented evidence
that Appellant engaged in an adulterous affair with April Lamphere and fathered her child. He
feared that his adultery might lead to imprisonment. He also feared that if he were to file for divorce,
he would lose his house, lose custody of his son, and be required to pay child support. He believed
he would receive the insurance proceeds after Lynn's death.

 When considered jointly, the testimony of the non-accomplice and accomplice witnesses is
both legally and factually sufficient to connect Appellant with the commission of the crime. We
overrule the first eight points of error.

EVIDENTIARY ERROR


 In Points of Error Nine, Twelve, Thirteen, Sixteen, and Seventeen, Appellant complains of
various evidentiary errors. An appellate court must uphold a trial court's evidentiary ruling if it is
reasonably supported by the record and is correct under any theory of law applicable to the case. See
State v. Ross, 32 S.W.3d 853, 855-56 (Tex.Crim.App. 2000); Jones v. State, 833 S.W.2d 118, 125
n.15 (Tex.Crim.App. 1992); cert. denied, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993);
Keen v. State, 85 S.W.3d 405, 413 (Tex.App.--Tyler 2002, no pet.). We will not reverse the trial
court's decision to admit the evidence unless the record shows that the trial court abused its
discretion. Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990). There is no abuse of
discretion when the trial court's ruling lies within the zone of reasonable disagreement. Powell v.
State, 63 S.W.3d 435, 438 (Tex.Crim.App. 2001); Keen, 85 S.W.3d at 413.

Character Evidence


 In Point of Error Nine, Appellant complains of the admission of character evidence. He
specifically contends that references to the following "bad acts" should have been excluded:

 Appellant hosted barbeques at his home while his wife was in Saudi Arabia;

 He failed to send money to his wife;

 He did not always answer the telephone when his wife called;

 He accused his wife of having an affair;

 He allowed other women into his home while his wife was in Saudi Arabia;

 He allowed other men to live in the their home while his wife was away;

 He permitted women to visit him at work;

 He permitted lower ranking military personnel to socialize with him;

 He argued with his wife about purchases of baby furniture;

 He had an affair that produced a child;

 He failed to support Lamphere's child;

 He discussed with Lamphere what they should name the child;

 He fought in public with his wife;

 He frequented bars; and

 His wife was murdered. 

 We begin with the Rules of Evidence: 

 Evidence of other crimes, wrongs or acts is not admissible to prove the character of
a person in order to show action in conformity therewith. It may, however, be
admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident, provided
that upon timely request by the accused in a criminal case, reasonable notice is given
in advance of trial of intent to introduce in the State's case-in-chief such evidence
other than that arising in the same transaction. 

Tex.R.Evid. 404(b). Upon proper objection, the trial court is required to conduct a balancing test
to determine the admissibility of the evidence. Rojas v. State, 986 S.W.2d 241, 250 (Tex.Crim.App.
1998); Williams v. State, 958 S.W.2d 186, 195 (Tex.Crim.App. 1997); Keen, 85 S.W.3d at 413-14. 
The trial court is presumed to have done so in ruling on the objection unless the record indicates
otherwise. Rojas, 986 S.W.2d at 250; Santellan v. State, 939 S.W.2d 155, 173 (Tex.Crim.App.
1997); Keen, 85 S.W.3d at 414.

 Evidence of extraneous offenses has been held to be admissible for the purpose of showing
the circumstances surrounding solicitation. Bell v. State, 768 S.W.2d 790, 796 (Tex.App.--Houston
[14th Dist.] 1989, pet. ref'd). Evidence of motive is admissible even if it involves an extraneous act
of misconduct if relevancy outweighs the potential for undue prejudice. Gosch v. State, 829 S.W.2d
775, 783 (Tex.Crim.App. 1991); cert. denied, 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722
(1993); Keen, 85 S.W.3d at 413-14; Roy v. State, 997 S.W.2d 863, 867 (Tex.App.--Fort Worth 1999,
pet. ref'd).

 The evidence of other wrongs or bad acts by Appellant was admitted to establish proof of
motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. 
We find no error in the admission of the evidence. Tex.R.Evid. 404(b). Point of Error Nine is
overruled. 

Crime Scene Photographs


 In Point of Error Twelve, Appellant challenges the admission of crime scene photographs
during the punishment phase which was tried to the bench. He objected that the probative value of
the pictures was substantially outweighed by the danger of unfair prejudice. See Tex.R.Evid. 403. 
At issue are nine photographs of the bedroom scene where Lynn's body was found, her upper torso,
defensive wounds on her hands, and the frontal and side views of her gaping neck wounds cased by
deep knife incisions.

 When reviewing the admissibility of a photograph, we must first determine whether it was
relevant. Long v. State, 823 S.W.2d 259, 271 (Tex.Crim.App. 1991), cert. denied, 505 U.S. 1224,
112 S.Ct. 3042, 120 L.Ed.2d 910 (1992)(construing former Rule 403 of the Texas Rules of Criminal
Evidence). If we determine the photographs were relevant, we must then engage in a balancing test. 
Id. Several factors should be considered in determining whether the probative value substantially
outweighs the danger of unfair prejudice to the defendant, such as the number of exhibits offered,
their gruesomeness, their detail, their size, whether they are black and white or color, whether they
are close-up, whether the body is naked or clothed, and the availability of other means of proof and
the circumstances unique to each. Williams v. State, 958 S.W.2d 186, 195 (Tex.Crim.App. 1997);
Long, 823 S.W.2d at 272. The Court of Criminal Appeals has consistently held that photos are
generally admissible where verbal testimony about the same matters is admissible. Ramirez v. State,
815 S.W.2d 636, 647 (Tex.Crim.App. 1991). 

 The Texas Code of Criminal Procedure authorizes the introduction of extraneous
offense evidence during the punishment phase. Tex.Code Crim.Proc.Ann. art. 37.07, §
3(a)(Vernon Supp. 2003). Without question, the murder was an extraneous offense for which
Appellant was not charged. The photographs were relevant to the manner and means of Lynn's
death. Each differed from the others in some respect and demonstrated the nature of her injuries. 
They were offered to demonstrate that Lynn was killed by a knife wound in a manner that coincided
with the scenarios Appellant had described. He told Patrick Muller that he should kill Lynn by
stabbing her in the throat and making it look as if she fell on a knife. Appellant explained a similar
scenario in which Muller was to go to Appellant's house, sneak in through the unlocked front door,
find the knife that would be hidden around the corner, and stab Lynn in the neck. Appellant told
Muller that if he stabbed Lynn in the neck, she would be unable to scream. We agree with the State
that it was proper for the murder to be considered in the assessment of punishment. Finding the
photos relevant and more probative than prejudicial, we overrule Point of Error No. Twelve.

 Evidence of Collateral Crimes


 In Point of Error Thirteen, Appellant complains that the State sought to punish him for the
collateral crime of Lynn's murder. Under the doctrine of res gestae, the State is allowed sufficient
latitude to elicit relevant testimony of the facts and circumstances surrounding the charged offense. 
The State may ask the fact finder to consider how those facts and circumstances serve as aggravating
or mitigating factors in determining the severity of the punishment to be assessed for the charged
offense. Rushing v. State, 813 S.W.2d 646, 650 (Tex.App.--Houston [14th Dist.] 1991, pet. ref'd). 
However, the State must avoid encouraging the fact finder to include additional punishment for a
collateral offense. Lomas v. State, 707 S.W.2d 566, 569 (Tex.Crim.App. 1986). There, the
prosecutor asked the jury to "add on" or "tack on" punishment for a collateral offense that was
established as part of the evidence. Id. at 569. The Court of Criminal Appeals recognized the
delicate balance between a defendant's right to be punished only for the offense for which he has
been convicted and society's interest in punishment that is tailored to a complete and full
understanding of the defendant's culpable mental state regarding commission of that offense. Id. 
The State is limited to showing that the collateral offense in some fashion "enhances the gravity of
the charged offense and, in fact, is inexorably connected with the charged offense." Id. 

 During the punishment phase of trial, the State asked Norma Armstrong, Lynn's mother, how
Lynn's death had affected her. And during final argument, the prosecutor referenced Armstrong's
testimony:

 We heard from Norma Armstrong today that she is a mother who will now proceed
without her daughter. We heard about Triston, a five-year-old little boy. And why
did we hear about these individuals? Because of Roger Reister. 


Appellant contends that these statements were improper because he was not charged with Lynn's
murder. We disagree. The murder was a collateral offense that was directly related to the separate
solicitations. The State did not seek additional punishment; Armstrong's testimony and the
prosecutor's closing argument were tailored to a complete understanding of Appellant's culpable
mental state. We overrule Point of Error Thirteen.

Admission of Autopsy Report


 In Point of Error Sixteen, Appellant argues that the trial court erred in admitting the autopsy
report because it was irrelevant and did not show that he had solicited anyone. The State countered
that Appellant's name was not mentioned in the report and nothing in it connected Appellant to the
murder. Appellant then claimed that the report was hearsay, and that the prejudicial effect
outweighed its probative value. Tex.R.Evid. 403. 

 The two page autopsy report, prepared by the County of El Paso Medical Examiner, indicated
that Lynn Reister was thirty years old and six months' pregnant at the time of her death. It listed the
pathological diagnosis of death as a gaping incise wound of the head and neck which had transected
the carotid artery and the jugular vein. No photographs were included in the report, nor did it refer
to Appellant or state that the cause of death was murder. 

 As we have already articulated, we review the trial court's ruling under the above-mentioned
abuse of discretion standard. Robbins v. State, 88 S.W.3d 256, 262 (Tex.Crim.App. 2002); see
Montgomery, 810 S.W.2d at 391-93. The evidence was clearly relevant and possessed significant
probative value. The suggested method of death, as indicated by the testimony, was to cut Lynn
Reister's throat with a kitchen knife. Because the medical examiner concluded that the actual cause
of death was a deep incise wound to the neck, we conclude that the probative value of the autopsy
report did not substantially outweigh the danger of unfair prejudice. Consequently, we overrule
Point of Error Sixteen.

 In Point of Error Seventeen, Appellant complains that the trial court admitted the autopsy
report without a limiting instruction. He requested that the jury be instructed that "the purpose for
which the extraneous offense of the murder of Lynn Reister was put into evidence was to show why
the witnesses came forward. You may not use it for any other purpose." We must conclude that this
issue has been waived. 

 The State originally offered the autopsy report in its entirety. What follows is the debate at
the bench, out of the presence of the jury, concerning the admissibility of the full report:

 Ms. Vandenbosch [Prosecutor]: Your Honor the State is going to offer State's
Exhibit 39, the autopsy performed on Lynn Reister. Dr. Stern left town while under
subpoena. We previously discussed this.


 Mr. Segall [Defense]: Your Honor, we understood it was going to come in as part of
the proffer.


 The Court. What is 39?


 Mr. Segall: 39, the autopsy.


 The Court: 39 is the autopsy?


 Ms. Vandenbosch: I'm sorry, 38.


 Mr. Segall: We understand that's part of the proffer and we don't object to it coming
in as part of the proffer. As coming in as part of the case, we object to it as it goes
to considerable gruesome detail over the murder and all the --


 The Court: You have an objection to the admission of it as evidence?


 Mr. Segall: Yes, ma'am.


 The Court: What is your objection?


 Mr. Segall: It's not relevant to any of the issues. It doesn't show that he did or did
not solicit any person at any time.


 Mr. Bright [Defense]: His name is not mentioned. There's no connection in the
evidence with this autopsy and our client.


 Mr. Gibson [Prosecutor]: We talked about the murder of Lynn Reister. We talked
about the manner of murder and possible scenarios of the murder. I think it goes to
it. 

 

 The Court: The objection is overruled.


 Mr. Segall: Your Honor, we'd further object that it's hearsay, that it's -- that it goes
to matters that deny us confrontation, that it denies us -- that we are willing to
stipulate and told the Court and the State that we were willing to stipulate that Dr.
Stern would testify that she is dead, because of Dr. Stern being removed from the
jurisdiction by the federal government. I don't want to think -- but to go into the
actual details of it, we think under the balancing test of 403, that its probative value,
which is none, is too far outweighed by its harmful -- when you start reading about
the fetus and everything else.


 And finally, we would like a limiting instruction, if we are going to let it in for
whatever purpose that it is supposed to be let in for, because it's definitely not
evidence that this man offered anybody --


 The Court: You had previously entered into a stipulation regarding the fetus and the
sex, or rather, DNA makeup of the fetus.


 Mr. Bright: The paternity.


 The Court: The paternity of the fetus, and your objection as to this exhibit being
hearsay I have to sustain. Do we have any other sponsor for the exhibit?


 Ms. Vandenbosch: Then, Your Honor, the State would ask for a motion for
continuance until Dr. Stern can be back in El Paso to testify concerning this case. 
She's under subpoena. She was under a court order and chose to leave.


 Mr. Segall: Your Honor, our position on it is it has no relevance to any of the issues
of this case ultimately, that under a balance, that Dr. Stern was to be offered, as I
understood the State's proffer, as part of the proffer and not part of the case.


 The Court: All right. Then I will sustain also that objection. However, I understand
that you will enter into a stipulation as to the declaration of the deceased and the way
in which she died.


 Mr. Segall: Yes, ma'am.


 The Court: You will reduce it to writing, such as that stipulation.


 Ms. Vandenbosch: Can it be the first two pages of the autopsy?


 The Court: We can --


 Mr. Segall: They're offering the first two pages and I'm trying to talk my co-counsel
into agreeing with that.


 Mr. Bright: I'm not going to agree if the Court is going to admit it. The Court is
going to admit it over our objection?


 The Court: The first two pages?


 Ms. Vandenbosch: Yes, Your Honor.


 The Court: All right. I will receive State's Exhibit 38, which is the first two pages
of the medical examiner's autopsy on Lynn Reister as 38. 


Once the jury returned, the exhibit was formally offered:


 Ms. Vandenbosch: Yes, Your Honor. The State would have the record note that
State's Exhibits 46, 38, and 31 have been offered into evidence.


 The Court: With no objection, they are received into evidence. 


When the State first offered the full autopsy report, defense counsel urged a number of objections,
which were clearly sustained by the trial court. The defense also requested a limiting instruction,
which was unnecessary at the time since the objections had been sustained. Thereafter, the State
offered the first two pages of the report. Mr. Segall indicated his effort at trying to convince
Mr. Bright to agree to the tender. While Mr. Bright did not acquiesce, neither counsel requested a
limiting instruction when the court announced its intent to admit the exhibit. The limiting instruction
was not mentioned until the charge conference the next day.

 A party opposing the admission of evidence shoulders the burden of objecting and requesting
the limiting instruction upon introduction of the evidence. Tex.R.Evid. 105; Westbrook v. State, 29
S.W.3d 103, 115 (Tex.Crim.App. 2000); see Garcia v. State, 887 S.W.2d 862, 878 (Tex.Crim.App.
1994), cert. denied, 514 U.S. 1021,115 S.Ct. 1368, 131 L.E.2d 223 (1995)(once evidence is received
without a proper limiting instruction, it becomes part of the general evidence in the case and may be
used as proof to the full extent of its rational persuasive power). Because Appellant's request was
untimely, we overrule Point of Error Seventeen.

REMUNERATION


 Points of Error Ten and Eleven address the aggravating element of remuneration. In Point
of Error Ten, Appellant argues that the trial court erred in not granting his motion to quash the
indictment for failing to give notice of the nature of the remuneration. The indictment alleged in
four counts that Appellant solicited three people--Patrick Muller, Brian Broxterman, and Rodney
Reister--on four occasions to murder Lynn Reister for remuneration and the promise of
remuneration. At the heart of this complaint is Rodney's motivation in killing Lynn. Appellant
maintains that Rodney's murderous actions stemmed from his love for Appellant rather than the
promise of payment. In Doty v. State, 585 S.W.2d 726 (Tex.Crim.App. 1979), the majority found
that both the payment and promise of payment had been averred by the State as the conduct beyond
mere preparation which rendered the defendant liable for the attempted offense. Majid, 713 S.W.2d
at 407. Liability for solicitation does not necessitate the act beyond mere preparation. The
solicitation offense is complete when the culpable request or inducement is unilaterally presented. 
Id. at 407. A meeting of the minds is not even required. Unilateral guilt of solicitation may be
established solely by the communication presented by the defendant, accompanied by his culpable
intent and belief alone. Doty, 585 S.W.2d at 730-31 (Clinton, J., concurring.); Majid, 713 S.W.2d
at 407-08. The promise to pay and actual payment are not proof requirements for the State; they are
alternative forms of committing the offense of solicitation of capital murder. Tex.Pen.Code Ann.
§ 19.03(a)(3); Schwenk v. State, 733 S.W.2d 142, 149 (Tex.Crim.App. 1981). We overrule Point
of Error Ten.

 In Point of Error Eleven, Appellant argues that the trial court erred in not limiting the
definition of remuneration to tangible benefits. He requested the following instruction:

 You are instructed that remuneration is defined as some benefit or compensation. It
does not include an intangible benefit. 


The charge included the first sentence and excluded the second. Appellant argues that the failure
of the charge to inform the jury that remuneration did not include an intangible benefit permitted the
prosecutor to argue that something other than a tangible benefit, such as brotherly love, could
constitute remuneration. The prosecutor argued the following during summation:

 Rodney said that he couldn't believe what Roger had done to him. He felt betrayed
and he was very mad. 'I asked Rodney why he killed Lynn. He said he did it strictly
for love, because he loved his brother, Roger. Rodney said there was no money
involved, but Roger said he was going to take care of Rodney.'


 What did I tell you the very first day we were here? What is murder for hire? What
is remuneration? It is the promise of a benefit in the future. It's a promise of a
benefit, or promise of a future benefit. What is that? Does it have to be money? No.
Can it be me taking Ms. Vandenbosch to work every morning for a week? Yes. 
That's what it is, murder for remuneration. 


Appellant did not lodge an objection to this argument.


Standard of Review



 When reviewing charge error, we utilize a two-step process. Orona v. State, 52 S.W.3d 242,
249 (Tex.App.--El Paso 2001, no pet.). Our first task is to determine whether error actually exists
in the charge. Almanza v. State, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984); Orona, 52 S.W.3d at
249. In determining whether charge error exists, we must view the charge as a whole and our review
should not be limited to a series of isolated statements or parts of the charge standing alone. Orona,
52 S.W.3d at 249; see Holley v. State, 766 S.W.2d 254, 256 (Tex.Crim.App. 1989). Second, we
must determine whether sufficient harm resulted from the error to require reversal. Almanza, 686
S.W.2d at 171; Orona, 52 S.W.3d at 249. Which harmless error standard applies depends upon
whether the defendant objected. Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex.Crim.App. 1994);
Orona, 52 S.W.3d at 249. In a case where the defendant failed to object, he must show that he
suffered actual egregious harm. Almanza, 686 S.W.2d at 171; Orona, 52 S.W.3d at 249.

Definition of Remuneration


 The Penal Code does not define "remuneration" but the term is not limited to a salary,
payment, or reward paid to an agent by his principal in a strict murder-for-hire situation. Beets v.
State, 767 S.W.2d 711, 734 (Tex.Crim.App. 1987)(Opinion on Reh'g). The Court of Criminal
Appeals has defined remuneration as a reward given or received because of some act. Rice v. State,
805 S.W.2d 432, 434 (Tex.Crim.App. 1991); Beets, 767 S.W.2d at 734. This definition
encompasses a broad range of situations but it does not encompass an intangible benefit or reward. 
See Rice, 805 S.W.2d at 435.

 With respect to the jury charge, words which have not been statutorily defined are to be given
their ordinary meaning. See Boyd v. State, 811 S.W.2d 105, 112 (Tex.Crim.App. 1991). Thus, the
trial court should not have given any definition of the term. See Neumuller v. State, 953 S.W.2d 502,
511 (Tex.App.--El Paso 1997, pet. ref'd)(holding that it is unnecessary to define remuneration in
charge). Appellant does not contend that the trial court should have given no instruction on the
issue. After all, the definition given is part of a definition he specifically requested. Instead, he takes
issue with the trial court's failure to further inform the jury that remuneration does not include an
intangible benefit. The State responds that there is no error because the definition which was
submitted was not incorrect or misleading. We agree. Reversible error only occurs in the giving of 

an abstract instruction when the instruction is an incorrect or misleading statement of a law that the
jury must understand in order to implement the commands of the application paragraph. See Plata
v. State, 926 S.W.2d 300, 302-03 (Tex.Crim.App. 1996), overruled on other grounds, Malik v. State,
953 S.W.2d 234 (Tex.Crim.App. 1997). The instruction is a correct statement of law and there is
no indication that it misled the jury as the State offered sufficient evidence to support the
remuneration element. Moreover, the example given by the prosecutor in his final argument, giving
a co-worker a ride to work as a reward for some act, is an example of a tangible benefit rather than
an intangible benefit. Point of Error Eleven is overruled.

CHARGE ERROR


 In Points of Error Fourteen and Fifteen, Appellant challenges what he terms an incomplete
definition of "beyond a reasonable doubt." The charge contained the following:

 All persons are presumed to be innocent and no person may be
convicted of an offense unless each element of the offense is proved beyond a
reasonable doubt. . . .


 The prosecution has the burden of proving the defendant's guilt and it must do so by 

 proving each and every element of the offense charged beyond a reasonable doubt 
and if it fails to do so, you must acquit the defendant.


 It is not required that the prosecution prove guilt beyond all possible doubt; it is
required that the prosecution's proof exclude all reasonable doubt concerning the
defendant's guilt.


 In the event that you have a reasonable doubt as to the defendant's guilt after
considering all the evidence before you, and these instructions, you will acquit him
and say by your verdict, 'Not guilty.' 


 Consistent with due process, the State is required to prove each element of an offense beyond
a reasonable doubt. See Tex.Pen.Code Ann. § 2.01; Tex.Code Crim.Proc.Ann. art. 38.03
(Vernon Supp. 2003). The federal constitution neither requires nor prohibits the giving of a
definition of reasonable doubt. Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583
(1994). Further, no particular form of words must be used when advising the jury of the
prosecution's burden of proof. A defendant has long been entitled to have the reasonable doubt
standard applied in the jury charge or instructions (6) but Texas did not require that the reasonable
standard be defined until the decision in Geesa v. State, 820 S.W.2d 154 (Tex.Crim.App. 1991). 
Several years later, the Court of Criminal Appeals determined that the better practice is to give no
definition of reasonable doubt to the jury. Paulson v. State, 28 S.W.3d 570, 573 (Tex.Crim.App.
2000)(overruling the portion of Geesa which required trial courts to instruct juries on the definition
of "beyond a reasonable doubt"). The court noted, however, that no reversible error would occur if
both the State and defense agreed to give the Geesa definition to the jury. Paulson, 28 S.W.3d at
573.

 Citing Phillips v. State, 72 S.W.3d 719 (Tex.App.--Waco 2002, no pet.), Appellant maintains
that the instruction is contrary to Paulson and effectively lessened the State's burden of proof. In
Phillips, the defendant objected to a only a portion of an instruction similar to the instruction here. 
The Waco Court of Appeals found the instruction contrary to Paulson but deemed it harmless. 
Phillips, 72 S.W.3d at 721. Some courts have declined to follow Phillips or have held that it is not
error to include such an instruction in the charge. See Minor v. State, 91 S.W.3d 824, 828-29
(Tex.App.--Fort Worth 2002, pet. filed); Carriere v. State, 84 S.W.3d 753, 759 (Tex.App.--Houston
[1st Dist.] 2002, pet. filed); Vosberg v. State, 80 S.W.3d 320, 323-24 (Tex.App.--Ft. Worth 2002,
pet. filed); see also Brown v. State, 91 S.W.3d 353 (Tex.App.--Eastland 2002, no pet.)(holding
defendant did not suffer egregious harm from instruction). But see Rodriguez v. State, 96 S.W.3d
398 (Tex.App.--Austin 2002, pet. ref'd)(holding that the instruction is definitional "in a sense" and
therefore violates Paulson). We agree with those courts holding that the challenged instruction does
not constitute a definition of reasonable doubt and, therefore, does not violate Paulson. See Minor,
91 S.W.3d at 829; Carriere, 84 S.W.3d at 759. Points of Error Fourteen and Fifteen are overruled. 
 Having overruled all seventeen points of error, we affirm the judgment of the trial court. 



June 5, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


(Do Not Publish)
1. Throughout the trial, Patrick Muller was frequently referred to by witnesses as "Mo."
2. Captain Moore testified that Lamphere told him she wanted Appellant punished; he did not recall her wanting
him "behind bars." Her allegations of adultery could have led to Appellant being "chaptered" from the Army--a general
discharge which would have affected Appellant's pending medical discharge.
3. Muller did not have a key to the Reister home. 
4. Appellant told him that he could clean up the knife and put it back in the butcher block or dispose of it. 
Appellant told Muller to take the jewelry that was in the bedroom. 
5. The defense offered testimony from an employee of the Stampede that he had not seen Appellant in the club
on May 17.
6. See Pigg v. State, 162 Tex.Crim. 521, 287 S.W.2d 673, 675 (1956).