Mohammed M. MAJID, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–85–00272–CR.

Court of Appeals of Texas,
El Paso.

July 16, 1986.

Harris E. Kerr, Midland, for appellant.

Al. W. Schorre, Jr., Dist. Atty., Midland, for appellee.

STEPHEN F. PRESLAR, C.J., and OSBORN and SCHULTE, JJ.

OPINION

SCHULTE, Justice.

This is an appeal from a conviction for solicitation to commit capital murder. The jury assessed punishment at forty-five years imprisonment. We affirm.

■ Ground of Error No. One contends that the indictment is fundamentally defective in that it fails to allege that Appellant requested and attempted to induce an intentional or knowing act of homicide. The indictment alleges:

> [T]he defendant, with the intent that a capital felony, to-wit: capital murder, be committed, did then and there intentionally and knowingly request and attempt to induce another, namely, ROY HARRISON, to engage in specific conduct that under the circumstances surrounding the conduct of ROY HARRISON as the said defendant believed them to be, would constitute capital murder, to-wit: the said defendant did then and there intentionally and knowingly request and attempt to induce ROY HARRISON to cause the death of an individual, LISA DOOLY BELL, for renumeration [sic] and the promise of renumeration [sic]. . . .

The solicitation cases cited by Appellant do indeed include an allegation that the ultimate actor's homicidal conduct be intentional or knowing. That is a more desirable manner of averment, but does not render the present pleading defective. Appellant's initial reliance is upon *Ex parte Winton*, 549 S.W.2d 751 (Tex.Crim.App. 1977), which overturned a burglary conviction for failure to plead intentional or knowing entry. First, we note that in *Winton* the defendant was charged with entry and commission of theft. Hence, the omission of the statutory mens rea requirement was fatal. Had Winton been charged with

entry with intent to commit theft, the specific culpable intent would have sufficed for the omitted general criminal intent. In any event, the present case does not present a problem under *Winton*. Winton was not granted appellate relief because the indictment failed to allege the mens rea required for the subsidiary theft offense, but for failure to aver the primary mens rea associated with the burglary. See: *Ex parte Cannon*, 546 S.W.2d 266 (Tex.Crim. App.1976); *Johnson v. State*, 537 S.W.2d 16 (Tex.Crim.App.1976). The present complaint is that the indictment fails to allege one of the constituent elements of the subsidiary murder offense. That is not a defect. The indictment tracks the elements of solicitation as set out in Penal Code Section 15.03(a), including the Appellant's alleged mens rea. It further identifies the ultimate offense intended, capital murder, and identifies which provision of Penal Code Section 19.03(a)(3) is relied upon (murder for remuneration).

Appellant suggests the indictment fails to allege an offense since Appellant could have requested or induced Harrison to perform an act which caused the death of Lisa Bell without being murder. The present indictment specifically negates this hypothetical as a basis for guilt by: 1) specifying that Appellant intended a capital felony be committed and 2) requiring that the jury find that the request or inducement be for Harrison "to engage in specific conduct *that under the circumstances surrounding the conduct of ROY HARRISON* as the said defendant believed them to be, *would constitute capital murder....*" Consequently, under this indictment, Harrison's intended conduct would have to have been capital murder, *intentionally* or *knowingly* causing the death, before Appellant could be found guilty. Appellant's hypothetical and complaint are without merit. The indictment presents no error, either fundamental or subject to a motion to quash. Ground of Error No. One is overruled. ...

■ Ground of Error No. Two contends that the charge was fundamentally defec-

tive in the same regard urged above. We disagree for the same reasons cited above. The charge, tracking the indictment in this respect, did require the jury to find that the solicited offense would have been capital *murder*, including murder, on the part of Roy Harrison. This is especially true in light of the abstract instructions given the jury which defined murder as intentionally or knowingly causing the death of an individual and capital murder as committing murder for remuneration. Ground of Error No. Two is overruled.

■ Ground of Error No. Three alleges a fatal variance between the indictment and the charge. The former alleged remuneration and the promise of remuneration. The charge referred only to promise of remuneration. Appellant relies upon *Doty v. State*, 585 S.W.2d 726 (Tex.Crim.App. 1979), which reversed a conviction where the indictment alleged remuneration and the promise of remuneration, but the proof showed only a promise to pay. *Doty*, however, dealt with a prosecution for attempted capital murder, not solicitation to commit capital murder. The distinction is critical to the present complaint and is addressed specifically by Judge Clinton in his concurring opinion in *Doty*. Attempt culpability arises when the defendant has performed an act beyond mere preparation which tends but fails to effect the commission of the ultimate offense intended. Tex. Penal Code Ann. sec. 15.01(a). In *Doty*, the majority found that both the payment and promise of payment had been averred by the State as the conduct beyond mere preparation which rendered the defendant liable for the attempt offense. The State was therefore required to prove both to support a finding of guilt. Liability for solicitation does not necessitate the act beyond mere preparation. The solicitation offense is complete when the culpable request or inducement is unilaterally presented. A meeting of the minds is not even required. Unilateral guilt of solicitation may be established solely by the communication presented by the defendant, accompanied by his culpable intent and belief

alone. *Doty,* at 730–731 (Clinton, J., concurring.) *Both* elements, promise to pay *and* actual payment, were not proof requirements for the State in this case. They were alternative forms of committing the offense of solicitation of capital murder. They appear disjunctively in the statute. Tex.Penal Code Ann. sec. 19.03(a)(3). They were pleaded conjunctively and potentially could have been charged in the disjunctive, with guilt founded upon proper proof of either. *Hill v. State,* 625 S.W.2d 803 (Tex. App.—Houston [14th Dist.] 1981), *affirmed,* 640 S.W.2d 879 (Tex.Crim.App. 1982). Instead, the court properly conformed the charge to the evidence, which clearly demonstrated no actual payment, and deleted the payment allegation. Ground of Error No. Three is overruled.

Ground of Error No. Four alleges the court erred in denying a new trial due to misdirection of the jury as argued under Grounds of Error Nos. One, Two and Three. Finding no error presented in those complaints, Ground of Error No. Four is also overruled.

Grounds of Error Nos. Five and Six assert ineffective assistance of counsel and are addressed below.

■ Grounds of Error Nos. Seven and Eight allege prosecutorial misconduct in the withdrawal of a plea bargain agreement reached on the second day of trial. After offers of twenty-five and twenty years were rejected, Appellant accepted a sentence recommendation of fifteen years imprisonment. The agreement was withdrawn five or ten minutes later, and the trial continued. Appellant does not contend that the State could not withdraw from a plea bargain but rather that under the circumstances of this case, the withdrawal had a prejudicial effect upon his ability to assist counsel and participate in the remainder of the trial. These grounds of error present no authority. *Phillips v. State,* 511 S.W.2d 22 (Tex.Crim.App.1974); *Daniel v. State,* 486 S.W.2d 944 (Tex.Crim. App.1972). In his motion for new trial, Appellant testified in a conclusory manner that he "broke down" and became totally demoralized by the withdrawal of the plea bargain. He contends, without specification, that he was thereafter unable to consult with or assist counsel, or fully appreciate the proceedings. Trial counsel also testified at the new trial hearing, but was not asked to evaluate the effect upon his client during the remainder of the trial. He voiced no opinion as to the quality of assistance and consultation rendered after the withdrawal of the plea. These grounds of error are unsupported by either the record or existing case law. Grounds of Error Nos. Seven and Eight are overruled.

■ In Grounds of Error Nos. Nine, Ten, Eleven, Twelve, Thirteen, Fourteen and Fifteen, Appellant presents various challenges to the sufficiency of the evidence. The supporting arguments are presented in two clusters. The first alleges insufficient evidence that Appellant intended to solicit a capital felony or an intentional or knowing killing. The second challenges the adequacy of the evidence to satisfy the corroboration requirement of Tex.Penal Code Ann. sec. 15.03(b):

> A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances *strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.* [emphasis added].

Appellant's seven grounds of error essentially require this Court to determine whether there is sufficient corroborative evidence that Appellant initiated a solicitation to commit an intentional or knowing homicide with the promise of remuneration and whether he intended Officer Harrison to act upon the solicitation. Notwithstanding the demonstration of possible malice on the part of the intermediary Robert Campbell and the assault on his credibility as a witness, we find sufficient corroboration in the audio and video taped comments and behavior of the Appellant himself.

Appellant's trial explanation of these events was that Campbell was aware of his distress over his brother's child custody

fight with the targeted victim named in the indictment, Lisa Bell, Appellant's ex-sister-in-law. Campbell initiated all nefarious schemes directed against her. First, he purportedly suggested a kidnapping of the child involved. This was considered but rejected by Appellant. Next, Campbell suggested planting "dope" on her to establish a claim that she was an unfit mother. Appellant agreed to proceed with this plan, to be carried out by a friend of Campbell's from Dallas. Then Campbell suggested a permanent solution of killing Lisa Bell, which Appellant claimed he immediately rejected. Thus, he testified that they continued with the "dope" planting scheme. He stated that he believed Harrison, posing as one Scotty Reynolds, was going to carry out that plan only, not murder. Appellant points to the absence of any taped reference on his part to killing or murder. His argument is reinforced by segments of tape recorded conversations taken out of context, in which "elimination" or murder references are made only by Campbell or Harrison. This Court has reviewed all of the tapes and finds the evidence clearly sufficient on the issues challenged by the Appellant.

Campbell testified that he became acquainted with the Appellant and his brother when they began to manage a convenience store next to the fruit stand where Campbell worked. As the acquaintance deepened, Appellant began to discuss his concern over the divorce and child custody troubles experienced by his brother. In early March, 1985, Appellant initiated a suggestion for Campbell to earn some money by arranging the kidnapping of Appellant's niece and her removal to Mexico. Next, Appellant asked if Campbell would eliminate Lisa Bell, the mother, permanently. When Campbell believed the Appellant was serious, he contacted the Texas Rangers but was referred to local authorities. He reported the solicitation to then Deputy Sheriff George Thompson. Thompson introduced Campbell to Sheriff Painter and Deputy Harrison. Harrison was to pose as a contract killer and friend of Campbell's.

Campbell would arrange a meeting between the two.

State's Exhibit 1a is a tape recording of seven contacts between Campbell and the Appellant, some recorded over the telephone and some by body microphone. The first call was made from the sheriff's office to the Appellant. Campbell indicated that he had been in touch with his friend in Dallas and wanted to know if Appellant was still interested. He attempted to discuss the matter then, but Appellant stated he did not want to talk on the telephone. They arranged to meet at approximately 11:30 p.m. that night. The second taped conversation disclosed that meeting. Campbell said his friend had a short time free before some other commitments. He would do "the job" for $3,000.00 plus $400.00 for expenses. He wanted the expenses plus one-half of the fee up front, the second half when the job was finished. He also needed a picture of the woman so he would know he had the right person and he needed details of her daily habits. Appellant agreed to the price and agreed to provide the information requested. He balked at the method of payment stating:

> The only drawback, like I said, is the advance. I don't agree upon that. If the job is done, on the spot ... on the spot, if he feels that he can do it, I am here all the time working. This is my means of livelihood.... ... The payment will be made right on the spot. The job is done—right on the spot.

A third meeting led to no discussion because of the customer traffic at Appellant's store. In the fourth conversation, Campbell told Appellant that the friend would come to Midland to discuss the matter but at least wanted the $400.00 expense money to come. If the deal did not go through he would return it. Appellant agreed to a meeting but still refused any advance payment. When the job was done, Appellant would be notified by a third party and the money would be paid on the spot. Appellant repeated that no payment would be made until he received confirmation that the job had been done; he referred to the arrangement as a "gentlemen's agree-

ment." In the fifth conversation, Campbell notified Appellant of Harrison's expected arrival. In the sixth conversation, he told Appellant that Harrison had arrived and was waiting at the Executel Motel. Appellant expressed a desire to meet at a site of his own choosing. He was worried about the possibility of bugging devices. Campbell said he would talk to Harrison (Reynolds) and call back. In the seventh conversation, Campbell tells Appellant that Harrison had checked into Room 319 at the motel. Campbell and Appellant agreed to meet at a Kent Convenience Store and go to the motel.

State's Exhibit 29 (and 29b, a laboratory enhanced copy of 29) contains two conversations between Campbell and the Appellant, one on the way to the motel meeting with Harrison and one after that meeting. In the first conversation, Campbell repeats that he and Harrison met in the service in Viet Nam and did a little mercenary work together. Appellant expressed a desire to search Harrison for possible recording devices. Static interrupts much of the conversation but Campbell makes a statement that "most of them will carry their weapons with them." To which Appellant responds that a recording device or microtape is what he is most concerned about.

Campbell and Appellant arrived at the motel and went to Room 319. The meeting is revealed by State's Exhibit 26 (Exhibit 26b being another audio-enhanced copy). After introductions by Campbell, Appellant tells Harrison that he would prefer to talk outside. Harrison expresses concern about being seen together, but agrees to go to Campbell's car. On the way, Appellant asks to frisk Harrison, offering to submit to a frisk himself. Harrison protests successfully. Then the following exchange took place:

> Harrison: I can do what you need to be done in three or four days.... If you want the job done I can do it. My reason for doing it—I did it overseas. You'll find very few people that'll pull the trigger or do something on somebody. A lot of people can't do it. Rob-

ert can't do it. He can do a lot of things but he can't do ...    *    *

> \*    \*    \*

> Appellant: I have been very clear with Robert [Campbell] about this matter.... I want a clean thing and I don't want no complications at all.

> Harrison: There's not going to be any complications.

> \*    \*    \*    \*    \*    \*

> Deal is—ever how you want it done—somebody tells you one of the best things to do is make it look like an accident. That's awfully hard to do.

> Appellant: How the thing is to be done is for you to assess.... How, when, what—I don't want to get into that. Normal way would be the best.

This was followed by more discussion of the requirement of confirmation before payment. Harrison reiterated his need for background information on the woman involved. Appellant would not discuss it out loud, but offered to write down the information. They obtained some motel stationery and Appellant wrote down Lisa Bell's name, residential address and business address. He also described her vehicle. He produced a photograph of Lisa Bell and later made a photocopy for Harrison to keep. Appellant had Harrison recopy the written information, retaining the originals written in his own handwriting. At the close of the conversation in the motel lobby, Harrison tried to summarize the deal:

> Harrison: I need you to understand this. This is between you and I. If I go down there and I kill this girl.

> Appellant: [grunts]

> Harrison: I go down there and I kill this girl, I'm going to expect $3,400.00 cash.

> Appellant: Look, I don't know—let's not be more explicit about this point.

> Harrison: I don't want to go through Robert.

> Appellant: After the materialization, how, if it is not to be done, you know, if it is not to be given to a media, how is it to be?

Harrison returned to Room 319 and waited with Campbell while Appellant copied Lisa Bell's photograph. After some additional conversation in the room, Appellant stated that Campbell and Harrison would not regret knowing him. They would be offered overseas jobs under different terms, fifty percent in advance and fifty percent upon completion.

Campbell and Appellant then left the motel. The second portion of State's Exhibit 29 (and 29b) reveals their conversation. Appellant expresses concern about Harrison's persistence in asking for details and asking too many questions.

One thing that bothered me about him. He wanted me to come up with the specific, you know, word for what was to be done. I did not get into specifics.... I did not want to say because if he had a recording device with him.... He specified the word.... I have conveyed it to Robert, and Robert has explicitly told you what needs to be done.... I made like I was ignorant about it.

The Appellant's spontaneous comments amount to a tacit admission of what he was so careful to avoid in overt expression with Harrison. In context, the critical word was "kill." These are not the words of a man shocked at the purported miscommunication of a dope planting scheme turned murder. Appellant admits in State's Exhibit 29 that the job to be done was murder. He asserts his own conscious avoidance of the word. His concern is not that Harrison is engaging to commit murder, but that he is verbalizing it. In his effort to avoid overt expression and yet maintain communication, Appellant simply states to Harrison that everything has been explained to Robert. Robert then replies in the affirmative:

Campbell: I told him you needed a person eliminated.... You want it to look like an accident though, don't you?

Appellant: I told him everything that will look more natural. I did not want to get into any specifics. That way there will be no evidence. Let's say he's a cop. I would have to look at it

from a negative angle. That way I can always be on guard.

A similar exchange occurred later:

Appellant: I just totally ignored a direct answer. I just said I told Robert what I wanted.

Campbell: Well, you just needed a person eliminated, that's what you needed, and you needed it done in such a way that it looks normal, looks normal, looks natural.

In neither instance did Appellant, who had purportedly rejected an earlier murder suggestion by Campbell and who had just engaged the services of Harrison who used the words "pull the trigger" and "kill," protest Campbell's recitation of what the desired objective was.

State's Exhibit 16 is a taped telephone call between Harrison and Appellant on March 23, 1985. Harrison refers to an exchange of packages and they arrange to meet at 5:00 p.m. State's Exhibit 28 is a video tape of the meeting between Harrison and Appellant. Law enforcement personnel had contacted Lisa Bell and informed her of the situation. She agreed to help arrange a fake death scene. Harrison provided Appellant with a polaroid photograph of her apparent corpse, as well as her driver's license and social security card. Appellant looked at an Abilene newspaper. Harrison said he wouldn't find anything in the newspaper. Appellant asked why not, and Harrison replied that you don't just drop the body in the street. Appellant refused to pay, not because he had contracted for a dope planting rather than a murder, but because he had not received satisfactory confirmation. He referred to their "gentlemen's agreement." That is an expresssion he originated on a earlier tape. His reference to that concept and his continued insistence on confirmation evidence a continuity between the original contract and the purported murder related by Harrison.

The evidence from Appellant's own mouth, in dealing with Campbell and Harrison, his tacit admissions in response to Campbell, his reaction to the murder report

by Harrison, all corroborate the essential elements of the solicitation offense. How can one plant "dope" so it looks accidental? Is "pulling the trigger on someone" more expressive of murder or planting marihuana in someone's vehicle?

The remaining question is whether the murder solicitation originated with Campbell or Appellant. On Exhibit 29 (29b), after leaving the motel, the following statement is made by Campbell:

> It's like *when you approached me* with it. You know I was skeptical of you *when you approached me* with it, you know. And then *after you talked to me about it,* I said well the man's dead serious, you know. So that's why I got in touch with Scotty [Harrison]. [emphasis added].

Appellant tacitly admits this version of who initiated the contract by his silence. At no point does he say, "wait a minute, you brought this idea up, you approached me," just as when Campbell twice expressly reiterates what Appellant wanted done, i.e., elimination, there is no protest. The evidence was clearly sufficient and sufficiently corroborated to support the jury's verdict. Grounds of Error Nos. Nine through Fifteen are overruled.

■ In Ground of Error No. Sixteen, Appellant contends that over objection, State's Exhibit 1a was improperly admitted without satisfying the predicate set out in *Edwards v. State,* 551 S.W.2d 731 (Tex.Crim. App.1977). The specific objection at trial and on appeal is the adequacy of the identification of the voices recorded on the tape. This tape contained the first seven contacts between Appellant and Robert Campbell. Of the seven contacts, two were recorded by body wire, with the speakers under visual observation. One had no substantive content. Four were telephonic. Harrison testified that he reviewed all of the recordings after they were made and found that they were accurate, with no alterations or deletions. He and Investigator Monte Weddel were famliar with the use of the recording equipment and had used it numerous times. The equipment was in good working order and the tape was new. Harrison identified the speakers. Appellant's objection at trial was that Harrison had not yet met him when Exhibit 1a was made and could only hear Campbell's side of the four telephone contacts. Nonetheless, Harrison's identification at trial was based upon his recognition of Appellant's voice after two extended face-to-face meetings and one brief telephone call. Campbell was not asked to review the tape, but did refer to the various conversations contained on it and described the participants and their individual comments. Appellant himself testified and was asked about the tape recorded conversations. His responses were not sufficient to satisfy all of the *Edwards* predicate but did lend corroborative support to the one prong dealing with identification of the recorded voices. Furthermore, the speakers identify themselves on all of the telephonic recordings. *Edwards* does not require explicit responses to predicate questions. Some of the requirements for admissibility may be inferred from the surrounding evidence. That is certainly the case here. Ground of Error No. Sixteen is overruled.

■ In Ground of Error No. Seventeen, Appellant asserts without supporting authority that State's Exhibit 27 was inadmissible due to its inflammatory effect. The exhibit depicted a portion of the staging of Lisa Bell's death scene, in which bull blood was applied to her body. The scene had already been verbally depicted without objection. *Harris v. State,* 661 S.W.2d 106 (Tex.Crim.App.1983). We do not find the exhibit so inflammatory as to preclude its admission. The manner in which the death scene was staged was contextually relevant to the final meeting between Harrison and Appellant and of probative value to the jury in assessing the import of Appellant's response. Ground of Error No. Seventeen is overruled.

■ Again without supporting authority, Appellant complains in Ground of Error No. Eighteen of the admission of Lisa Bell's testimony contained at pages 303 to 309 of Volume V of the record. The testi-

mony referred to the length of time during which Appellant lived with his brother and sister-in-law, the relationship between Appellant and Bell, her visit to her in-laws' home in Bangladesh, her divorce and child custody battle with Appellant's brother, the current residence of her child and the existence of another brother of Appellant, living in Bangladesh. The information was non-prejudicial background information depicting the family context out of which the crime arose. It was relevant in light of the motive suggested by the State's evidence. Ground of Error No. Eighteen is overruled.

In Ground of Error No. Nineteen, Appellant complains of two portions of the State's closing argument at the guilt stage. The first was a reference to his foreign nationality. The second referred to potential overseas murder contracts suggested by Appellant during and after the meeting at the Executel Motel. Contrary to the assertion in Appellant's brief, the prosecutor never based his argument on Appellant's Shiite Moslem religion or made any argument references to contemporary world terrorist events. Both arguments complained of were based upon testimony elicited without objection. The first comment as to nationality was in the context of asking the jury to appraise the demeanor of the Appellant, both in court and as depicted on the audio and video tape exhibits. Appellant's defense was significantly founded upon his being an easily manipulated foreigner with a language barrier. The first argument complained of was proper in light of the evidence and credibility issues raised.

The second argument was based upon comments made by Appellant to both Harrison and Campbell at the Executel Motel and to Campbell after leaving the motel. Given his defensive explanation that he thought he was engaging Harrison only to plant "dope" on Lisa Bell and not to murder her, these future job offers were relevant to a jury determination of his intent and his awareness of the murderous objective of the meeting. Both references made were within the proper scope of jury argu-

ment. *Alejandro v. State*, 493 S.W.2d 230 (Tex.Crim.App.1973). Ground of Error No. Nineteen is overruled.

In Grounds of Error Nos. Five and Six, Appellant alleges ineffective assistance of counsel. The first three complaints (failure to challenge the indictment, failure to object to the charge and failure to move for a directed verdict based upon insufficiency of evidence) we find to be without merit, based upon our conclusions as to the indictment, charge and adequacy of the evidence expressed previously. None of those grounds were overruled due to a failure to preserve error or through reliance on *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim. App.1985).

Appellant's fourth complaint is that trial counsel failed to pursue a change of venue. A conflict in testimony arose at the new trial hearing. Appellant and his brother testified that trial counsel was specifically requested to seek a change of venue prior to trial and that he indicated that an appropriate motion had been filed. No such motion was in fact filed. Trial counsel testified that he was never instructed to seek a venue change. Venue was discussed with Appellant prior to trial in terms of the level of publicity attending the trial and the nature of the defense to be presented. Counsel stated that as a matter of trial strategy he felt Midland was the best option for trial and so advised his client. Apparently, Appellant responded to reporters' questions at the time of his arrest asserting that he had been "set up" or "framed". This was in fact the defense approach originally envisioned and pursued throughout the trial. Thus, the publicity in Midland was tactically viewed as providing mixed blessings. Furthermore, counsel testified that he was concerned with the possibility of being transferred to a more rural county, with a less sophisticated jury pool and a greater difficulty in effectively presenting the type of defense contemplated. The change of venue complaint is without merit. The conflict in the testimony offered by Appellant and counsel was

subject to the fact finding resolution of the trial judge.

Finally, Appellant contends that trial counsel failed to properly exercise pretrial discovery and failed to discover a portion of his tape recorded conversation with Harrison outside the Executel Motel. Counsel acknowledged that all tapes were made available by the State and that he had copies made for his pretrial review. In the copying process, a brief portion was not reproduced. The segment covered Appellant's conversation with Harrison between the time they left the motel room and entered the lobby. The only significant statement made during this period was Harrison's comment about "pulling the trigger" on someone. Counsel testified that he first heard this portion during trial. Neither he nor appellate counsel has suggested what changes in defensive posture would have or could have been carried out had this segment been discovered sooner. In any event, given the overall performance of trial counsel, this isolated failure cannot be said to amount to less than reasonably effective assistance, presenting a reasonable probability of a different result had it not occurred. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Grounds of Error Nos. Five and Six are overruled.

The judgment is affirmed.