

# NUMBER 13-20-00072-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SANDRA CORTINAS A/K/A
SANDRA RAMIREZ,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

## On appeal from the 156th District Court
## of Live Oak County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Longoria, and Tijerina
### Memorandum Opinion by Justice Longoria

Appellant Sandra Cortinas a/k/a Sandra Ramirez appeals from her conviction for solicitation of capital murder. *See* TEX. PENAL CODE ANN. § 15.03(a)(d)(1). In four issues, appellant argues: (1) the trial court improperly excluded appellant's expert witness from testifying; (2) the trial court erred when it denied appellant from cross-examining a witness

about his criminal history; (3) the trial court improperly admitted text messages into evidence; and (4) the evidence was insufficient to support a conviction. We affirm.

## I. JURY TRIAL

The State's indictment alleged appellant

on or about the 6th day of December, A.D., 2018, and before the presentment of this indictment in the County and State aforesaid, did then and there, with intent that capital murder, a capital felony be committed, request, command, or attempt to induce Lance Rathke to engage in specific conduct, namely kill Rene Cortinas in exchange for $200.00, that under the circumstances surrounding the conduct of the defendant, as the defendant believed them to be, would have constituted capital murder.

## A. State's Case in Chief

### 1. Detective Jason Alvarez

The State first called Detective Jason Alvarez from the Bee County Police Department who testified that in November 2018, Michael "Big Mike" Villareal informed him that a woman was attempting to hire someone to kill an individual. Detective Alvarez explained that he knew Villareal through Villareal's criminal history and gang membership, his time in jail, and from contact with him "on the streets." Detective Alvarez stated that he had a lot of contact with Villareal during the course of his career and referred to Villareal as "an associate." Occasionally, Villareal would contact Detective Alvarez with tips when he would hear of something illegal going on. Detective Alvarez clarified that Villareal did not receive anything in return for his tips regarding criminal activity.

When Villareal contacted Detective Alvarez in November 2018, he informed him that appellant wanted Rene, her ex-husband, killed. After speaking with Villareal, Detective Alvarez did some research and determined that neither appellant nor Rene

2

resided in Bee County. Because Rene was a resident of Live Oak County, Detective Alvarez contacted the Live Oak Sheriff's Department. Detective Alvarez spoke with Investigator Lance Rathke from the Live Oak Sheriff's Office, relaying the details of his conversation with Villareal. Subsequent to their conversation, Detective Alvarez brought Villareal to meet Investigator Rathke at the Live Oak Sherriff's Office, introduced the two, and allowed Investigator Rathke to interview Villareal on his own. Detective Alvarez was not involved beyond the introduction. He had no further involvement in the case aside from receiving notice of appellant's arrest in the matter.

### 2. Michael "Big Mike" Villareal

Villareal testified that he had known appellant for most of his life. At one point, Villareal was dating appellant's sister, and he lived with appellant, her sister, her sister's child, and Rene. He and appellant kept in contact and spoke on occasion. He explained that he was previously in a gang and also dealt drugs, but that he is no longer in the gang and stopped dealing drugs in 2016.

Villareal explained that near the end of November 2018, appellant called him and stated that she wanted her "baby daddy" "out of the way." He testified that he was not exactly sure what she meant or if she was serious. He said he asked her if she wanted someone to "whip his butt or whoop his ass or something," but she was clear she "wanted him out of the way." He said he had never been approached for something like that, and decided he needed to tell Detective Alvarez, whom he considered a friend. He stated that it was the first time he had ever reached out to Detective Alvarez to present him with information about criminal activity, but admitted he was honest with Detective Alvarez if

3

he ever had questions about who someone was. However, Villareal explained he "never went to [Detective Alvarez]" except in this situation.

After speaking with Detective Alvarez and informing him of appellant's request, a meeting was set up by Detective Alvarez between Investigator Rathke and Villareal. Villareal did not testify as to what exactly occurred in the meeting, but explained that after the meeting, he initiated a text conversation with appellant. The text messages, which were admitted over appellant's objection, contained a conversation in which Villareal tells appellant that he has a "meth head" who is "willing to get the job done only if [appellant is] serious." Appellant asks "[h]ow much" and they discuss a payment of $200. Villareal testified that he gave Investigator Rathke's contact information to appellant as the "meth head." Villareal stated that after he shared the phone number with appellant, he was not involved in the meeting between appellant and Investigator Rathke. He said he checked to see "if everything went okay" after the meeting and that appellant told him "it was done." Villareal stated that he was testifying at trial because of a subpoena and that he was fearful of repercussions for his testimony.

On cross-examination, Villareal testified that he and appellant were just friends, and never had a romantic relationship. He stated that they spoke occasionally, sometimes to check in and other times when appellant was "looking for [cocaine]." Villareal explained that he called Detective Alvarez for advice after he spoke to appellant because "she told me she wanted her baby daddy out of the way" and he described the situation as "serious." He explained that he never previously called Detective Alvarez for serious situations when he was involved in a gang because he "was still doing [his] dirt" at the

4

time and that if someone "snitches" in a gang, there will be repercussions, stating the gang will "drop them."

### 3. Investigator Lance Rathke

Investigator Rathke testified that he was contacted by Detective Alvarez on November 29, 2018 regarding "someone who was looking for somebody to do them a job." He told Detective Alvarez and Villareal to "buy some time" until he could gather additional information and resources and be able to meet with them on December 3, 2018. After the meeting, he "instructed Mike Villarreal to give my number or get me in contact with the person who was looking to have someone killed" while he gathered the necessary resources for the investigation. On December 5, 2018, Investigator Rathke was contacted by "Sandy," who stated she got his phone number from "Big Mike," Villareal's alias. Investigator Rathke recorded his phone call with "Sandy." The call took place on a Wednesday, and Investigator Rathke testified that "Sandy" asked him to "kill her ex-husband" before Friday. They discussed a payment of $200 for the job and agreed to meet the next day.

The next day at a truck stop in George West, Investigator Rathke met with "Sandy" whom he identified as appellant. He testified that appellant explained she did not want her ex-husband to have custody of or visitations with their child. According to Investigator Rathke, appellant "wanted [Rene] killed and she wanted it to look like a robbery." While Investigator Rathke was driving, appellant gave him directions to Rene's home and provided information about Rene and the occupants of his home.

Their encounter was recorded, the recording was admitted into evidence and played for the jury without objection. During their drive to Rene's house, Investigator Rathke asks: "He's supposed to get killed by tomorrow?" to which appellant replies: "today," specifying she wanted it done before Rene picked up their son from school. Appellant told Investigator Rathke her plan was to wait until the school called to her to tell her that Rene did not pick up their son and she would go get him. Investigator Rathke asks if she is "sure" and reminds her "there's no bringing him back," and she confirms she is sure and she knows. Investigator Rathke says to appellant that there will be a "gunshot in the middle of the night" and asks if she knows if the neighbors will come running out, which she tells him she is not sure. After she says she has been "thinking about this for awhile," Investigator Rathke reiterates that she is going to get a phone call "that they found [Rene] with a bullet in his head and there ain't no taking that shit back."

After driving past Rene's house and discussing the job, Investigator Rathke returned to the truck stop, received $100 as an initial payment from appellant, and dropped her back off at her vehicle. Investigator Rathke subsequently obtained a warrant for appellant's arrest. The warrant was executed the next day and appellant was arrested for solicitation of capital murder.

Investigator Rathke further testified that while appellant was in Live Oak County Jail, she made a recorded phone call that he reviewed. He testified that he heard appellant tell a male that she did something "stupid" and that the charges against her were "real."

On cross-examination, Investigator Rathke confirmed that during his meeting with appellant, he indicated he may have more than one person, or a "team" assist him with

6

"the job" she was asking him to do. He testified that appellant did not seem skeptical that she could get a "team" for only $200. He also testified regarding his meeting with Villareal and stated that Detective Alvarez had "worked with" Villareal and he was relying on him to give good information. Investigator Rathke confirmed that he was the one who took the photographs of Villareal's text messages between Villareal and appellant. He stated that he did not confiscate Villareal's phone as he was not a suspect, he only took the photos of the conversation regarding the situation he was investigating.

The State rested after Investigator Rathke's testimony.

## B.     Expert Testimony Hearing

Appellant moved for a directed verdict, which was denied. Subsequently, prior to appellant putting on evidence, the State objected to appellant's expert witnesses. A hearing was held outside the presence of the jury.

### 1.     Jessica Brazeal

Brazeal, the Chief Programs Officer at New Friends New Life, works with survivors of sex trafficking and commercial exploitation. She is a licensed professional counselor. She described her expertise as "working with victims of trauma, specifically in the context of domestic violence . . . , counter-intuitive victims' behavior in the way that trauma impacts our brain and how that impacts someone when they have been in an abusive situation."

As it applies to appellant's case, Brazeal stated that she had not met with appellant, but that her testimony would be helpful "to explain some of the counterintuitive victim behaviors [and] the way that having experienced abuse at different periods of time

7

throughout your life may impact the choices someone might make in stressful or difficult situations." Her testimony would in large part come from watching and listening to the testimony of appellant. Aside from what she was told by appellant's attorneys regarding the case and appellant's history of victimization, Brazeal stated that she had not reviewed any case materials.

The State objected to Brazeal as an expert witness and the trial court overruled the objection, allowing Brazeal to be called as a witness. The trial court also allowed Brazeal to remain present in the courtroom during appellant's testimony.

### 2. Dr. David Beaver

Dr. David Beaver, who has a Ph.D. in linguistics, works as a professor at the University of Texas. He teaches "language and the brain" including "semantics and pragmatics," meaning "how context affects the meaning of what we say, why we choose to say what we say." In anticipation of his testimony, Dr. Beaver reviewed the recordings of the telephone call and meeting between appellant and Investigator Rathke, the text messages between Villareal and appellant, and appellant's call from jail. He explained that his role is to analyze the linguistics and the context of the recordings and text messages.

The trial court noted that his qualifications met the necessary requirements for an expert but asked what Dr. Beaver's opinions or testimony would do to assist the jury. The trial court specifically inquired as to Dr. Beaver's familiarity with South Texas culture, as he described culture as one of his parameters when interpreting language use. Dr. Beaver responded that while he was not particularly familiar with South Texas culture, he has

8

some knowledge of it and "in spite of that, my understanding of the context of the way that discourse works and dialogue works would be helpful to a jury who is trying to make sense of the words that in particular the accused used."

After testimony, the trial court heard argument and stated that the "concern is that . . . I don't see that he will do anything but confuse my jury. So convince me that his testimony is necessary and would not confuse my jury but in fact would assist the jury in determining the facts." Appellant's counsel argued that "[Dr. Beaver] is not here to comment necessarily on any South Texas cultural norms or trying to instruct [the jury] on how to think. He is merely taking the same evidence and providing an expert analysis from a linguistic field about what actually went on in those conversations." The trial court sustained the State's objection, finding Dr. Beaver's testimony unnecessary for the case.

Appellant put forth an offer of proof regarding what Dr. Beaver's testimony would have been. Dr. Beaver stated that he reviewed the recordings made in the case as well as the text message exchange. He prepared transcripts of the recordings and analyzed the evidence. His testimony largely focused on his interpretation of the roles of those who were involved in the conversations. He explained that appellant's role in each of the conversations was reactionary, she was never the initiator. He described hesitancy in her speech and confusion in her text messaging. He explained further that nothing in appellant's language indicated she was soliciting capital murder, with the exception of mentioning a robbery, she did not make any references to violence. At the close of the offer of proof, appellant re-urged the importance of Dr. Beaver's testimony and the trial court denied the request. Dr. Beaver was excused.

9

## C. Appellant's Case in Chief

### 1. Sandra Ramirez

Appellant was called to testify. She explained that starting at age seven, she had been sexually abused by various cousins. Appellant testified that at age fifteen, her mother "traded" her to a man named Carlos Cortinas, Rene's brother, for cocaine and the promise that Carlos would buy appellant school clothes. Carlos was twenty-eight years old. Appellant had her first child at age sixteen, Carlos is the father. While they were not married, Carlos referred to appellant as his wife. She was with Carlos for "less than five years," when Carlos went to prison. Carlos died in prison from cancer. She met Rene when he would visit Carlos at their home. Appellant testified that Rene "paid attention" to her and to her daughter. She began a romantic relationship with Rene when Carlos "kicked [her] out of the house." She was around nineteen years old at the time. She and Rene got married and had one son together. She has a total of six children, three with Carlos, one with Rene, and two by two different men. Appellant testified further that she takes medications for depression, anxiety, and sleep issues. She has been receiving treatment for mental health for eighteen years. She also admitted that she has a history of drug use, has had "a lot of different" sexual partners, and that she was not always a "great" wife to Rene.

Appellant testified regarding her relationship with Rene, stating that Rene would "trade" her for drugs, allowing other men to have sexual relations with her in exchange for drugs. She also stated that there were physical altercations with Rene. She and Rene were married for approximately ten years, but they separated when Rene was arrested

and sent to prison. She did not see Rene for "a good while" after he was released but explained that they went to court regarding child support and custody over their son. She testified that Rene was in and out of their son's life, never around for very long. Rene did not have a strong relationship with their son and their son did not really know much about Rene. Rene was granted joint custody of their son and appellant stated that "it broke [her] heart."

Appellant has known Villareal for a long time. She testified similarly to Villareal regarding his relationship with her sister and how they met. She explained that Villareal would call her to see how she was doing from time to time. She testified that she did not initiate a phone call to Villareal to discuss Rene, but that he had called to check on her after he saw a social media post she had made regarding the custody issue. She explained the custody rulings and how it made her feel. Appellant then explained that Villareal said something in Spanish that sounded like "tumbale cabron," which she stated means beating someone up; appellant stated that she "just said okay" in response. A couple of days after their phone call, Villareal sent appellant a text message, but appellant stated she needed him to refresh her memory. As to the text messages that were admitted as an exhibit, appellant could not remember whether the text conversation was complete but stated "I'm sure there was more, because, I mean, here is one message and then another one from me, and it's like they don't match up. I don't think they do, not all of them." She states that Villareal was the initiator, but when Villareal said he had someone to do the "job," she did ask "how much" it would cost and stated she was asking about how much it would be "to get Rene beat up."

11

After that conversation, she contacted the number from Villareal to discuss payment and the plan "to [beat] Rene up," Her intent was to keep Rene away from her and their son. She explained that she met up with the man she called to assault Rene, and they drove to Rene's house. The recording from that meeting was played, and she explained that her intent was to have Rene beat up, and when the man stated, "you just want him gone," she replied, "I don't give a damn" and laughed, she thought he was referring to "getting him out of our lives." She explained that she was not taking her medication at that point in time. She admitted that before she got out of the car, it was clear the plan was not to have Rene beat up. She said she did not think about it being a murder until a gun was mentioned. As the man instructed, she deleted all communications with him when she got out of the car. As she drove away, she stopped on her way home and "ended up puking." She said she called Villareal and "told him I didn't want to do anything. I was scared and I can't." she said that she never told Villareal that "it's done," as he testified to. She stated she had tried to call Villareal after that conversation, but he never answered her calls. She was arrested the next day.

On cross-examination, she admitted that she had said Carlos was the father of her first two children, but two other men were the biological fathers. She said that her testimony that Carlos was the father was because he raised them, not the other men. She further testified regarding the men that Rene forced her to have sexual relations with, and how it occurred numerous times. Regarding her current marriage, she stated that there was a period of time when she and her current husband had a violent relationship when her children were living with them. Appellant also admitted she did not believe Rene was

12

a threat to her children, but she indicated Rene's girlfriend had previously hit her son.

When discussing her phone calls made after her arrest, appellant stated she did not remember much, but she never told anyone she was "being set up" or that Rene "was just supposed to get beat up." A social media post from appellant was also discussed, wherein appellant posted:

> It's just fucked up That my sons sperm donor waited over 6yrs to come around & just like that he was granted joint custody. Fucker was never around. So for me the question is why now? I don't see how the judge it [sic] granted him joint custody if he's 100% disabled.

### 2. Jessica Brazeal

Similarly to the hearing, Brazeal testified regarding her professional background as a licensed professional counselor. She explained that her role in the past for trial testimony has been to discuss

> counterintuitive victim behavior, so things that individuals who have had any kind of abuse or trauma in their background, behaviors that they may exhibit or choices that they may have made that may feel confusing or counterintuitive to what we might assume someone may do in a situation like that by explaining how trauma impacts the brain and what causes that to happen in addition to patterns and dynamics of domestic violence and the way that those abusive relationships play themselves out typically.

Brazeal explained that prior to trial, she had not met with appellant, but that she was present for appellant's testimony. She was informed of some of the general information of the case relating to the charge and some background. Brazeal explained that appellant's trial testimony was "consistent with trauma reactions" she has seen in her career. She discussed the power dynamic that can be a struggle for women who have been abused in the way appellant described and that they can have self-esteem issues and be more susceptible to doing what others tell them to, rather than stating what they

13

want and doing what they want.

The defense rested after Brazeal's testimony.

**D.      Verdict**

The jury charge application paragraph stated

> Now, if you find from the evidence beyond a reasonable doubt that on or about December 6, 2018, in Live Oak County, Texas, the defendant, Sandra Cortinas AKA Sandra Ramirez, with intent that capital murder, a capital felony be committed, request, command, or attempt to induce Lance Rathke to engage in specific conduct, namely kill Rene Cortinas in exchange for $200.00, that under the circumstances surrounding the conduct of the defendant, as the defendant believed them to be, would have constituted capital murder, then you will find the defendant guilty of criminal solicitation as charged in the indictment. Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

The jury found appellant guilty as charged in the indictment. The jury sentenced appellant to twenty-eight years in the Institutional Division of the Texas Department of Criminal Justice and assessed a fine of $5,000.

This appeal ensued.

## II.      SUFFICIENCY OF THE EVIDENCE[1]

In her fourth issue, which we address first, appellant argues that the evidence was insufficient to support a conviction for solicitation of capital murder.

**A.      Standard of Review & Applicable Law**

In order to determine if the evidence is legally sufficient in a criminal case, an appellate court reviews all of the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of

---

[1] The State did not file a brief to assist in the resolution of this appeal.

14

the crime beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 905 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give great deference to the trier of fact and assume the factfinder resolved all conflicts in the evidence in favor of the verdict. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We will uphold the verdict unless the factfinder "must have had reasonable doubt as to any essential element." *Id.*

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The offense of criminal solicitation is found in § 15.03 of the Texas Penal Code:

(a) A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, [s]he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding [her] conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission.

(b) A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.

(c) It is no defense to prosecution under this section that:

(1) the person solicited is not criminally responsible for the felony solicited;

(2) the person solicited has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution;

(3) the actor belongs to a class of persons that by definition of the felony solicited is legally incapable of committing the offense in an individual capacity; or

(4)     the felony solicited was actually committed.

(d)     An offense under this section is:

    (1)     a felony of the first degree if the offense solicited is a capital offense; or

    (2)     a felony of the second degree if the offense solicited is a felony of the first degree.

TEX. PENAL CODE ANN. § 15.03. The offense of solicitation is complete when the defendant has intent and acts to induce another to engage in felonious conduct. *Whatley v. State*, 946 S.W.2d 73, 79 (Tex. Crim. App. 1997); *State v. Brinkley*, 764 S.W.2d 913, 915 (Tex. App.—Tyler 1989, no pet.); *Majid v. State*, 713 S.W.2d 405, 407–08 (Tex. App.—El Paso 1986, pet. ref'd).

## B.     Intent

Appellant challenges the State's evidence proving she intended for Rene to be killed in exchange for $200. In order to support a conviction for criminal solicitation pursuant to § 15.03(a), the evidence must establish that the defendant acted with the specific intent that capital murder be committed. *Richardson v. State*, 681 S.W.2d 683, 687 (Tex. App.—Houston [14th Dist.] 1984), *aff'd*, 700 S.W.2d 591 (Tex. Crim. App. 1985).

The State's evidence regarding the criminal solicitation charge was elicited from two main witnesses: Villareal and Investigator Rathke. In addition to the testimony of both witnesses, the State admitted evidence including text messages, phone calls, and recordings of appellant discussing the crime with both Villareal and Rathke. Appellant also testified in her defense, wherein she admitted she was soliciting someone to harm

16

Rene, though she denied that she intended he be murdered. Herein lies appellant's argument that she did not intend for Rene to be murdered and the State did not prove such intent.

"Culpable mental state may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Atkinson v. State*, 517 S.W.3d 902, 906 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.). Here, the jury heard testimony from Villareal that he was asked by appellant to find someone to make Rene "go away." Investigator Rathke, in his communications with appellant, discussed the crime she wanted him to commit, specifically stating he would put a bullet into Rene's head. Appellant did not dispute that Investigator Rathke said this, though she testified this was the first time murder was mentioned. At that point, however, she did not stop the request, but rather, the jury heard testimony that she agreed and paid Investigator Rathke an initial $100 to do the job. Given the jury is permitted to make reasonable inferences and we give deference to the jury's determination of a witness's credibility, we conclude the evidence supported a conviction for solicitation of capital murder. *See Brooks*, 323 S.W.3d at 905. Appellant's fourth issue is overruled.

### III. EXCLUDED EXPERT TESTIMONY

By her first issue, appellant alleges that the trial court erred by excluding testimony of her expert, Dr. Beaver. She alleges that the trial court's ruling denied her a meaningful opportunity to present a complete defense.

### A. Standard of Review & Applicable Law

Rule 702 of the Texas Rules of Evidence provides: "If scientific, technical, or other

specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. The proponent of scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Nenno v. State*, 970 S.W.2d 549, 560–61 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). A trial court's ruling on the admissibility of the scientific expert testimony is reviewed under an abuse of discretion standard. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). We uphold a trial court's ruling if it is within the zone of reasonable disagreement. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002).

Before admitting expert testimony, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela*, 209 S.W.3d at 131. Before admitting expert testimony, the trial court must determine that all three conditions are met. *Id.*

Because the first two prongs have are not in dispute, the only remaining question is relevance.

**B.      Relevance**

Appellant argues that Dr. Beaver's testimony was relevant to evaluate her intent. Specifically, she contends that because solicitation of murder is a "crime of language," Dr. Beaver's testimony regarding appellant's language and responses "was *critical* to the jury in its determination of guilt or innocence." Evidence is relevant if it has any tendency to make the existence of any fact of consequence more likely than it would be without the evidence. TEX. R. EVID. 401. "It is important, when determining whether evidence is relevant, that courts examine the purpose for which the evidence is being introduced." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009).

In his testimony during the hearing, Dr. Beaver explained in part that appellant was not showing "comprehension" of what the plan was. Specifically, after Investigator Rathke explains to her that Rene will have a "bullet in his head," her response was not "normal language that one would use" suggesting she was confused. This lack of comprehension, appellant argues, shows that appellant did not intend for Rene to be murdered, and therefore, the jury would have benefitted from the testimony of Dr. Beaver to enhance their understanding of the intent behind appellant's language in this case.

The trial court, however, found that Dr. Beaver's testimony would not be helpful to the jury. The trial court questioned Dr. Beaver's knowledge of South Texas culture, specifically because culture can change the meaning of vocabulary and words.

THE COURT:      What experience and/or knowledge do you have of the South Texas culture? Not this case.

19

THE WITNESS:     The culture.

THE COURT:       The South Texas culture, because that is one of the parameters, as I understand it, that you use.

DR. BEAVER:      That's true.

THE COURT:       If you don't have any experience with South Texas culture, I don't see that you could be helpful to my jury. That is where I'm going.

THE WITNESS:     I consider myself a Texan, but I don't consider myself a South Texan. I am from the highfalutin capital where people may accuse us of being disconnected.

I believe that I have gained some knowledge of the South Texan culture. I believe you're absolutely right, that the more cultural knowledge one has, the better one's ability to discern exactly what the meaning is.

I do believe that in spite of that, my understanding of the context of the way that discourse works and dialogue works would be helpful to a jury who is trying to make sense of the words that in particular the accused used. If one looks at the transcript, one finds a lot of uses, for example, of pronouns of *it*, like to *it*, and there is a question of what those mean.

Now, that isn't specific to southern Texas. That would be the case in northern Mississippi just as much or anywhere else in the English-speaking world. When one uses these either ellipses or things that are missed out completely or one uses these small words, the interpretation is very heavily dependent on the immediate context. One has to look carefully in that interpretation, and I think that linguistics provides helpful insight into the ways that human beings resolve—we call it resolve and after, so resolve those missing bits of information as they process a text. I would subscribe more of what I do at that level.

THE COURT:       Okay. All right.

20

At the conclusion of Dr. Beaver's testimony, the trial court stated: "I don't see that he will do anything but confuse my jury. So[,] convince me that his testimony is necessary and would not confuse my jury but in fact would assist the jury in determining the facts." After hearing argument, the trial court sustained the State's objection to Dr. Beaver and stated: "I don't believe that he is necessary for today's case."

Appellant argues that the trial court erred in determining that Dr. Beaver's testimony was unnecessary only because he lacks a familiarity with South Texas culture. The requirement that testimony be relevant to the jury is a "simpler, more straight-forward matter to establish." *Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011).

> [T]he question under Rule 702 is "not whether there are some facts in the case that the expert failed to take into account, but whether the expert's testimony took into account enough of the pertinent facts to be of assistance to the trier of fact on a fact in issue." Further, we noted that the expert's failure to account for some facts "is a matter of weight and credibility, not admissibility."

*Id.* (quoting *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim App. 1996)). While Dr. Beaver may not have had the familiarity with South Texas culture that the trial court was inquiring about, he did understand the necessary facts of the case and was able to apply his expertise in linguistics to those facts in an effort to assist the jury in understanding what appellant's language meant. Assuming without deciding that excluding Dr. Beaver's testimony was error, we proceed to a harm analysis. *See Jordan*, 928 S.W.2d at 556; *Olsen v. State*, No. AP-76,175, 2012 WL 1438475, at *10 (Tex. Crim. App. Apr. 25, 2012).

## C.    Harm Analysis

Rule 44.2(b) provides that errors in criminal cases which do not affect substantial rights are to be disregarded on appeal. TEX. R. APP. P. 44.2(b). "A substantial right is

21

affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "A criminal conviction should not be overturned for non-constitutional error [under Rule 44.2(b)] if the appellate court, after examining the record as [a] whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

> When conducting a harm analysis under Rule 44.2(b),
>
> an appellate court need only determine whether or not the error affected a substantial right of the defendant. To make this determination, appellate courts must decide whether the error had a substantial or injurious effect on the jury verdict. The very process of reaching this decision, is the performance of a Rule 44.2(b) harm analysis.

*Llamas v. State*, 12 S.W.3d 469, 471 & n.2 (Tex. Crim. App. 2000).

In assessing the likelihood that the jury's decision was adversely affected by the error, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *See Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). The reviewing court might also consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments and even voir dire, if material to appellant's claim. *See Llamas*, 12 S.W.3d at 471.

Here, appellant argues that the exclusion of Dr. Beaver's testimony rises to a constitutional violation because she was precluded from presenting a defense. We

22

disagree. Appellant was not precluded from presenting a defense; specifically, she testified regarding her conversations with Investigator Rathke and Villareal. She was able to give context to what she believed during those conversations and what she intended by her own words. While the jury may not have had the benefit of Dr. Beaver's explanation of linguistics, they were afforded the opportunity to hear, in appellant's own words, what she meant by her messages and language. Appellant also argues that the jury would have had the opportunity to read the transcripts created by Dr. Beaver; however, the jury had the recordings and video to review. Additional transcripts would not have had a substantial effect or influence in determining the jury's verdict. *See King*, 953 S.W.2d at 271. Accordingly, we find that while the trial court erred in excluding Dr. Beaver on the basis of his familiarity with South Texas culture, the wrongfully excluded testimony is not sufficient to warrant a reversal of appellant's conviction. *See id.* Appellant's first issue is overruled.

## IV.    CROSS-EXAMINATION

By her second issue, appellant argues that the trial court erred by preventing her from cross-examining Villareal regarding his criminal history. Specifically, she contends that this exclusion allowed the State to present "false impressions" of Villareal.

### A.    Standard of Review & Applicable Law

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010); *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Under this standard, we do not disturb the trial court's decision if the ruling was within the zone of reasonable disagreement. *Davis*,

329 S.W.3d at 803; *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008). We will uphold an evidentiary ruling on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

Texas Rule of Evidence 609(a) provides that witness credibility may be attacked by admitting evidence that the witness was previously convicted of a felony or crime of moral turpitude if the trial court determines that the probative value of admitting the evidence outweighs its prejudicial effect. *See* TEX. R. EVID. 609(a); *Meadows v. State*, 455 S.W.3d 166, 170 (Tex. Crim. App. 2015). However, an exception to Rule 609 applies when a witness makes statements concerning his past conduct that suggest he has never been arrested, charged, or convicted of any offense. *Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993); *Prescott v. State*, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988). Where the witness creates a false impression of law-abiding behavior, he "opens the door" on his otherwise irrelevant past criminal history and opposing counsel may expose the falsehood. *Prescott*, 744 S.W.2d at 131.

## B.    Analysis

Appellant argues that on multiple occasions, the trial court limited her ability to discredit Villareal's testimony regarding his "false impression" to the jury that he had "found Christ" in 2016 and turned his life around. While Villareal did mention he began attending church and it helped him change his life, he never testified that he had been a peaceful and law-abiding citizen. In fact, Villareal stated that he was in a prison gang, that he had been arrested and been to jail, had sold and used drugs, and was involved in illicit behaviors. He admitted he knew of many wrong-doings and even admitted he was

24

involved in criminal activity. The prior criminal history that appellant argues she should have been allowed to introduce occurred during the time that Villareal admitted he was engaged in criminal activity. While she does note that there were charges "in 2016 when [Villareal] found Christ," she does not explain why this testimony was necessary when Villareal himself admitted to the behaviors. He did not "open the door by claiming he had not been in trouble before." *Jackson v. State*, 11 S.W.3d 336, 341 (Tex. Crim. App. 1999). We fail to see the impeachment value of Villareal's prior criminal history. We overrule appellant's second issue.

## V. ADMISSION OF EVIDENCE

Appellant argues in her third issue that the trial court erred in "improperly admit[ting] into evidence, over objection, eight photographs of a mobile phone screen showing text messages."

## A. Standard of Review & Applicable Law

> "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). In a jury trial, it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. [*Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012)]. The trial court's determination of whether the proponent has met this threshold requirement is subject to appellate review for an abuse of discretion and should not be countermanded so long as it is within the zone of reasonable disagreement. *Id.* This has been aptly described as a "liberal standard of admissibility." Cathy Cochran, TEXAS RULES OF EVIDENCE HANDBOOK 922 (7th ed. 2007–08).

*Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015).

25

A witness might have "knowledge" of the authorship of a text message for a number of reasons. One reason might be that the witness is the actual author of the text message or that the witness personally observed the purported author actually type and/or send the message *Tienda*, 358 S.W.3d at 640. A witness might also claim to have knowledge that a text message came from a phone number known to be associated with the purported sender. The association of a cell-phone number with a particular individual might suggest that the owner or user of that number may be the sender of a text message. Indeed, the suggestion may be quite strong. Unlike so-called "land lines," commonly utilized by an entire household, cell phones tend to be personal and user-specific. *See Butler*, 459 S.W.3d at 601.

As with evidence in general, authenticating evidence may be direct or circumstantial. *See id.* at 602. In cases where a sponsoring witness may testify to an association between a cell-phone number and a purported author, other evidence may be available that might bridge the logical gap and permit a proper inference that the purported author sent the message. *See id.* The other evidence might include the message's "appearance, contents, substance, internal patterns, or other distinctive characteristics," which considered in conjunction with other circumstances support a conclusion that a message indeed emanated from the purported author. TEX. R. EVID. 901(b)(1); *see Butler*, 459 S.W.3d at 602.

## B. Analysis

Here, appellant herself authenticated the text exchange that she complains about on appeal. She does not dispute that she had the conversation with Villareal, she

specifically testified when looking at the exhibit that "[t]hey are text messages between [Villareal] and I." Her only contention in her testimony regarding the text messages is that she was not completely certain it was a complete record of the conversation, though she could not be sure. Appellant's argument on appeal that there was not enough evidence to authenticate the text messages falls flat because of appellant's own authentication of the messages.[2] While Villareal did not know appellant's phone number by memory, the pictures showed the phone number that sent the text messages, and appellant did not dispute that was her number. The pictures also contained the nickname for appellant that Villareal stated he used for her, "Sandie." Accordingly, because appellant authenticated the text exchange that she complains about on appeal, her third issue related to the admission of the text messages is overruled. *See Butler*, 459 S.W.3d at 601–02.

## VI.    CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
3rd day of March, 2022.

---

[2] To the extent appellant's complaint on appeal purports to argue completeness, we note that a complaint that the text messages were inaccurate or not the complete conversation goes to the weight of the evidence and not to its admissibility. *See Robinson v. State*, 739 S.W.2d 795, 802 (Tex. Crim. App. 1987) (complaint that evidence not "accurate" goes to weight not admissibility).